[Crim. No. 8264. In Bank. Nov. 19, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. EDWARD
LOUIS ARGUELLO, Defendant and Appellant.

Thomas Whelan, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, and William E. James, Assistant Attorney General, for Plaintiff and Respondent.

BURKE, J.—A jury convicted defendant of first degree murder and fixed the penalty at death. On appeal, the judgment was reversed insofar as it related to penalty but affirmed in all other respects. (*People* v. *Arguello* (1964) 61 Cal.2d 210, 215 [37 Cal.Rptr. 601, 390 P.2d 377].) At the second penalty trial it was stipulated that the matter of penalty be tried by the court without a jury on the basis of the transcript of the prior trial and arguments by counsel. The death sentence was again imposed, and this second automatic appeal is now before us. (Pen. Code, § 1239, subd. (b).)

Defendant, in addition to making claims of error regarding the second penalty trial, seeks to have the remittitur recalled and the judgment as to guilt vacated on the ground that statements by him inadmissible under *Massiah* v. *United States* (1964) 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246], and *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], were admitted into evidence at his trial on guilt. We have concluded that under the cited decisions his statements were improperly admitted and that the errors resulted in a miscarriage of justice. (Cal. Const., art. VI, § 4½; *Fahy* v. *Connecticut*, 375 U.S. 85, 86-87 [84 S.Ct. 229, 11 L.Ed.2d 171]; *People* v. *Watson*, 46 Cal.2d 818, 836 [299 P.2d 243].)

The facts set forth in our prior opinion are quoted below with deletions, as indicated, of evidence now held to be inadmissible and with additional facts shown in brackets:

''The body of Marie Chapman, an 82-year-old widow, was

found by a neighbor in the bathroom of her home in San Diego about 5 o'clock in the afternoon on November 9, 1961. According to the autopsy surgeon, death resulted from several skull fractures and lacerations of the brain and throat. Mrs. Chapman ordinarily kept the doors to her house locked and was cautious in admitting persons into her home. A police inspection of the house revealed nothing to indicate a forced entry. About 9:30 a.m. on the day Mrs. Chapman was killed a neighbor heard her talking to someone in an excited voice. Mrs. Chapman's sister-in-law telephoned her at 11 a.m. and got no answer.

''Defendant, who at the time of trial was 53 years old, had worked for Mrs. Chapman periodically for several years as a handyman. On the day Mrs. Chapman was killed he went to the home of his friend, Mrs. Josephine Mendoza, who lived in the same neighborhood as Mrs. Chapman. . . . [Defendant testified that he arrived at Mrs. Mendoza's home about 10:30 a.m.], but Mrs. Mendoza testified that he did not reach there until 11:30. . . . [While at her home he wiped his hands on a towel that may have been used by others, and a chemical analysis of the towel disclosed '''probable bloodstains.''] He changed his clothes at Mrs. Mendoza's home and gave his trousers to her daughter to wash. The police found blood on the trousers, and defendant explained that he had cut his finger while wearing them a few days before. · However, it was determined that the blood was not defendant's type and that it was the same type as decedent's. [The trousers were dirty, and dirt ''might'' affect the typing of blood, but a criminalist who performed a ·control test using an unstained portion of defendant's trousers formed the opinion that there had not been a false reaction in the present case. Another criminalist, in response to the question whether the blood might have been on the trousers five days or so (apparently prior to Mrs. Chapman's death), replied that this was possible.]

. ''A chemical analysis of a brick found in Mrs. Chapman's closet revealed 'the probable presence of blood,' and the autopsy surgeon testified that a brick could have caused the skull fractures. There was soil on the brick and on Mrs. Chapman's body, which tests disclosed was the same as that found in the yard behind the house of defendant's uncle, and the soils all· contained distinctive characteristics not commonly found in· soils. [The criminalist who performed the tests did not know in how many places the same soil could be found.] The police, while searching the yard, discovered what appeared to be an impression made by the narrow side of a brick, and

the brick found in Mrs. Chapman's closet had soil only on one of its narrow sides. Defendant had slept in a shed at his uncle's home the night before Mrs. Chapman was killed.

"A hammer was found attached to Mrs. Chapman's neck by a cord, and the autopsy surgeon testified that one of the injuries to her skull could have been inflicted with the hammer. Defendant had used the hammer, which belonged to Mrs. Chapman, while working for her. The cord was tied to the hammer by a type of knot which is not commonly used. [The knot was of a type used mainly for "securing sails on spars and booms."] When shortly after his arrest defendant was asked to tie a piece of cord, the knot he made was dissimilar to that used in fastening the cord to the hammer. Later, while he was awaiting trial, he tied a bundle of clothing with string, and the knot he made this time was identical with the one used to tie the cord to the hammer.

[The cord attached to the hammer was "comparable in every aspect" to cord found in the shed at the home of defendant's uncle. It was not a common type of cord but was a variety used in the navy. Defendant and his father testified they had given some cord of that type to decedent, and additional pieces of such cord were found at her home.]

[Defendant's palm print was on the toilet tank lid in decedent's bathroom. Defendant testified that the day before she was killed he had lifted up the lid of the toilet while working for her. No fingerprints were found on the underneath edge of the lid. A fingerprint of defendant was also on the "inside strike side" of the bathroom door frame. He testified that the day before she was killed he touched the frame when he closed the door and thereafter said that he did not touch the frame until he opened the door.]

"Mrs. Chapman had $58.60 in her purse a few days before she was killed, but a search of her home after her death disclosed only two silver dollars in a trunk and less than 50 cents in her purse. [An I.O.U. for $27 dated October 23, 1961, and signed by defendant was also discovered at Mrs. Chapman's home. Defendant denied having borrowed any money from her on that date and testified that every time he worked for her she would have him sign a receipt on a blank piece of paper and that she would then fill in the amount paid him.] Defendant had tried unsuccessfully to borrow $5.00 from Mrs. Chapman's sister-in-law on November 7, and he told Mrs. Mendoza the next day that he had only $2.00. He had about $35 when he arrived at Mrs. Mendoza's house on November 9,

the day Mrs. Chapman was killed, $10 of which he gave to Mrs. Mendoza. . . . [Defendant's testimony contained some inconsistencies relating to the amount of money he had on November 9. He testified that he showed Mrs. Mendoza $35 on that date, then said that he showed her $10 or $20, and later stated that he had about $30 that day.]

"Defendant took the stand in his own behalf and testified that he was not at Mrs. Chapman's house at any time on the day she was killed and that he did not kill her. [He admitted that he had previously been convicted of a felony, namely forgery, and the jury was instructed that the evidence of the prior felony was admitted for impeachment purposes only.]"

The evidence now asserted to have been erroneously admitted included testimony regarding statements by defendant (1) to the police during interrogation following his arrest and (2) to an undercover agent, Ernest Halcon. Defendant was arrested the day after Mrs. Chapman was killed. At the time of his arrest the police told him they wished to question him and asked him to accompany them to the police station. He went with them without asking any questions and made no statements en route to the station. After arriving there the police interrogated him three times that day and a fourth time on the following day. There was evidence that during the interrogations defendant stated, among other things, that he arrived at the home of Mrs. Mendoza about 9:30 or 10 a.m. on the day Mrs. Chapman was killed, that he had spent the prior night in a shed at his uncle's home, and that upon arising he had gone to a cafe for coffee and "window shopped" before going to Mrs. Mendoza's home. He was asked a number of times how much money he had when he arrived at Mrs. Mendoza's home, and each time he replied $9.00. He also told the police, in response to their questions, what he had done with the $9.00, and his account of his expenditures left him with the approximate number of cents he had when arrested. He denied ever having given Mrs. Mendoza any money but when shown a $10 bill Mrs. Mendoza had turned over to the police he admitted he had given it to her. He was also asked how his fingerprints got on Mrs. Chapman's purse, a situation that was untrue, and he replied that she had taken her purse from beneath a comforter on her bed, removed a deed from it, and handed the purse to him. (Her purse was found beneath a comforter on her bed.) Defendant also stated in response to questioning that he had taken the Independent newspaper into Mrs. Chapman's house on Wednesday, November 8, 1961, but when told that the

Independent found in her home was dated November 9, 1961, he changed his story and said that it was the Tribune he had taken into her house. (The Independent was not delivered on Wednesdays at that time.)

█ It appears that the police obtained the statements during the accusatory stage, since, at the time defendant uttered them, he was under arrest and the police were engaged in a process of interrogations that lent itself to eliciting incriminating statements. (See *People* v. *Hillery,* 62 Cal.2d 692, 712 [44 Cal.Rptr. 30, 401 P.2d 382] ; *People* v. *Stewart,* 62 Cal.2d 571, 577 et seq. [43 Cal.Rptr. 201, 400 P.2d 97].) No attorney for defendant was present during the interrogations, and it does not appear that defendant was advised of his rights to counsel and to remain silent or that he waived those rights. Thus the statements were inadmissible under *Escobedo* v. *Illinois, supra,* 378 U.S. 478, and *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].

█ It was also error to admit Halcon's testimony regarding admissions defendant made to him. Defendant was indicted for Mrs. Chapman's murder on December 7, 1961, and an attorney was appointed to represent him several days later. Thereafter, in April 1962, Halcon, an undercover narcotic agent for the State of California, was incarcerated on a fictitious charge following discussions with the prosecutor and as a pretense to enter the jail cell where defendant was held. Halcon testified that he told defendant that he, Halcon, was in jail for stealing and inquired why defendant was in jail; that defendant replied ''Suspicion of murder. . . . It was my hammer that killed her''; that defendant also said, ''They hit her with a hammer on the head, then cut her throat''; and that, during a card game, he asked defendant if he had done ''it,'' and defendant's only response was ''It's your turn.'' Halcon further testified that defendant asked to have Halcon's mother pray for defendant; that he told defendant his mother ''would have to know the truth in order to say this prayer, a Novena for thirty days if he was guilty, a Rosary for one week if he was not''; and that defendant replied, ''Tell her to pray a Novena.''

*Massiah* v. *United States, supra,* 377 U.S. 201, 206, held that the defendant was denied his right to counsel ''when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel.'' In that case a federal agent arranged with

one Colson, who had been jointly indicted with the defendant for violation of federal narcotics laws, for the installation in Colson's car of a radio transmitter. This device enabled the agent, who totally unbeknown to the defendant was parked nearby in a car with a receiving set, to listen to Colson's conversation with the defendant, and the defendant's statements thus elicited were introduced into evidence through the agent's testimony. Here, as in *Massiah,* statements were deliberately elicited from defendant by a government agent following defendant's indictment and apparently in the absence of counsel. Although in the present case, unlike *Massiah,* defendant thought the place where the conversation occurred was, or might be, wired for sound, the evidence does not show that he thought any government agent would in fact hear any statements he made. It does not appear that he had any knowledge that Halcon was a government agent rather than an inmate as Halcon had represented himself to be, nor does it appear that defendant thought he was speaking in a loud enough voice to be overheard by the use of a microphone, if any, in the jail. Under the doctrine in *Massiah* Halcon's testimony concerning defendant's statements should have been excluded.

From an examination of the entire record we have concluded that the erroneous admission of the testimony regarding defendant's statements to the police and Halcon resulted in a miscarriage of justice. (Cal. Const., art. VI, § 4½; *Fahy* v. *Connecticut, supra,* 375 U.S. 85, 86-87; *People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].) Halcon's testimony, if believed by the jury, was highly damaging to the defense.[1] The admissions Halcon testified defendant made included one tantamount to a confession of the murder of Mrs. Chapman. Some statements the police testified defendant made were of an incriminating nature. Others were exculpatory, but some were shown to be false, and such statements were used to impeach his credibility and to show a consciousness of guilt.[2] The prosecution, in the closing argument to the jury, discussed at some length Halcon's testimony concerning admissions by defendant and also repeatedly pointed to the evidence that defendant had made incriminating statements to the police and had made false statements, such as

[1]Defendant denied having made a number of the statements attributed to him by Halcon, including the statement that Halcon's mother should pray a Novena for defendant.

[2]Defendant admitted having made some of the statements to the police but denied or said that he did not remember having made others.

that he had only $9.00 when he arrived at Mrs. Mendoza's home on the day of the murder and that he arrived there about 9:30 or 10 a.m. that day. As we have seen, the identity of the killer was in issue. Defendant testified that he did not kill Mrs. Chapman and was not even at her home on the day she was killed. There was strong circumstantial evidence of his guilt, but this evidence is not so overwhelming as to nullify the prejudicial effect of the errors made. We are persuaded that it is reasonably probable that in the absence of the improperly admitted evidence a result more favorable to defendant would have been reached. (*People* v. *Watson, supra,* 46 Cal.2d 818, 836.)

There is no merit to the Attorney General's claim that the judgment of defendant's guilt was final before *Massiah* v. *United States, supra* (May 18, 1964) 377 U.S. 201, and *Escobedo* v. *Illinois, supra* (June 22, 1964) 378 U.S. 478, and that defendant is therefore precluded from now relying upon those decisions. The judgment on the issue of guilt was affirmed on March 25, 1964, and a petition for rehearing was denied on April 22, 1964. (*People* v. *Arguello, supra,* 61 Cal.2d 210.) Within the 90 days thereafter within which defendant could have applied for certiorari (see 28 U.S.C. § 2101 (d); Rules of United States Supreme Court, rule 22) *Massiah* and *Escobedo* were decided. The judgment as to guilt thus was not final before the date of those decisions. (*People* v. *Polk, ante,* p. 443 [47 Cal.Rptr. 1, 406 P.2d 641].)

It does not appear that the other issues raised are likely to arise upon retrial, and it is therefore unnecessary to discuss them here.

The remittitur in *People* v. *Arguello,* Crim. No. 7414, 61 Cal.2d 210 [37 Cal.Rptr. 601, 390 P.2d 377], is recalled and the judgment of the Supreme Court of March 25, 1964, vacated. The judgment appealed from is reversed in its entirety.

Traynor, C. J., Peters, J., Tobriner, J., Peek, J., and White, J.,* concurred.

McCOMB, J.—I dissent. I would affirm the judgment in its entirety. I am of the opinion that it is not reasonably probable that a result more favorable to defendant would have been reached in the absence of the errors noted in the opinion of the majority. (See Cal. Const., art. VI, § 4½.)

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.