[Crim. No. 461. Fifth Dist. Oct. 30, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. DONALD RAY HISER, Defendant and Appellant.

George T. Davis and Lynn Carman for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Edsel W. Haws and Nelson P. Kempsky, Deputy Attorneys General, for Plaintiff and Respondent.

CONLEY, P. J.—The defendant, Donald Ray Hiser, a minor of the age of 19 years, was convicted by a jury of voluntary manslaughter, an offense contained within the crime of murder alleged in the indictment. The victim was a 10-month-old baby, who was the illegitimate son of Ann Huie, the companion of the defendant, sometimes referred to in the briefs as his common law wife; the record shows that, while she was impregnated by another young man with the resulting baby who was afterwards killed, the relationship between the mother and father of the child did not persist, but, on the contrary, the defendant and the child's mother took up residence together as if they were married. It seems a legitimate inference from the evidence that both the mother and her paramour were infantile and scarcely worthy of being charged with the raising of a baby, that Hiser was jealous of the father, that one, at least, of his companions had poked fun at him for his unusual status in raising another man's offspring,

that he was highly irritated by the crying of the baby, and jealous, too, of the mother's affection for the child, and was periodically enraged by the situation in which he had been placed.

Hiser was indicted by the grand jury of Merced County on November 9, 1966. Various motions and other factors tended to delay the start of the actual trial, which after it was commenced took nine days to complete between April 6 and April 20. On the latter day, the jury found defendant guilty of voluntary manslaughter, an offense included within the murder charge. The matter was referred to the probation officer for a report, and, following that recommendation, the court ordered the imposition of sentence suspended and the defendant placed temporarily in the diagnostic facility of the Department of Corrections at Vacaville for a period of 90 days. On August 1, 1967, a diagnostic study made by the California Department of Corrections was filed in the court, and a supplemental report was thereafter prepared by the probation officer. On August 14, 1967, the court denied probation and committed the defendant to the California Youth Authority.

Extensive evidence was adduced during the nine-day trial. It showed that Ann Huie was a 17-year-old girl living in Merced when she became pregnant by Michael McDaniel in 1965. He was thereafter tried on the charge of statutory rape, found guilty, and sentenced to jail. Soon after the onset of Ann Huie's pregnancy she began dating defendant extensively. They had been friends before she became pregnant. Ann and defendant continued to see each other before the baby was born. She was living at that time in her mother's house. Defendant went to the hospital when the baby was born.

Ann Huie testified that she and Hiser had not had sexual relations before the baby was born but that they were begun some two months after the birth of the child. When the infant was about six or seven months old, Ann and the baby moved to an apartment, and she thereafter saw defendant frequently. There was evidence that defendant then seemed to care for the baby, that he was with the child often, and that he punished him rather frequently by spanking.

When defendant's parents, who were evidently serious, hardworking people, left for a vacation, Ann moved into defendant's parents' home, bringing the infant with her. Hiser's brother and sister-in-law were also staying there.

During that week, defendant slept a night or two with the baby; he changed the infant's clothes and fed him; Hiser testified, however, that the baby became ill and vomited severely during the week. The mother gave evidence that the baby was bruised by the punishment administered by Hiser. Appellant said the baby had fallen off the bed; there was testimony that by Friday, October 14, the child's only bruises were on the bottom of his body and on his mouth. The baby was left that afternoon with a neighbor for a time. The child ate apparently normally that evening and Ann and defendant then went with him to Nick's Drive-in where they met two boys and a girl. The boys drove in one car to another town, and the two girls drove around Merced with the baby on the back seat. When the young men returned, the five people drove into the country in two cars where they drank beer. Then all of them went to J's Coffee Shop; the baby was left in the car asleep on the back seat. Forty-five minutes later, Ann and defendant left the coffee shop and went to the Hiser home, some time after 1 o'clock in the morning. Defendant followed Ann, carrying the child into the house; the baby started to cry and appellant put the infant on the couch. His eyes were open and he seemed to be in a normal condition.

Ann, who went into the bathroom, heard the baby cry out twice but thought that it was a regular cry. But appellant called her in a few minutes, and she came to the den; the baby was lying in a different place on the couch, his eyes were rolled back, and he was unconscious. Jim and Florence, the brother and sister-in-law of defendant, were awakened. Jim and appellant left to take the baby to the hospital, and Ann came later. A pediatrician, Dr. Mason, saw the infant ten minutes after it arrived at the hospital. The baby was then incapable of breathing on its own. Emergency measures were taken, and the child began to breathe and was kept alive through Saturday, Sunday and until Monday afternoon when he died. Appellant went to the Hiser home early Saturday morning and took Ann back to the hospital. The two of them returned again to the hospital later Saturday morning. Sergeant Durggan of the sheriff's office interviewed defendant and Ann on Saturday, and took them to the jail premises. Ann told appellant, out of the hearing of Sergeant Durggan, that the police were going to take impressions of their teeth. Sergeant Durggan talked with defendant who said that he had taken some clothes into the garage the night before to put in the washing machine, smoked a cigarette, played with the

dog, and when he came back into the house he saw the baby's condition. And during the drive to the hospital he had tried. to start the baby's breathing by mouth-to-mouth resuscitation. Sergeant Durggan then interviewed Ann and talked with the two together. After this interview, Ann was booked, appellant was released, and the Sergeant took him home. Ann was held in jail through Saturday and Sunday. Donna Huie, Ann's sister, then returned from out of town and Sunday morning called defendant and asked if he had killed the baby, and he said he had had a blackout and could not remember. She then went to appellant's house and visited him. She urged appellant to go to the jail and talk to the authorities—to turn himself in, to let Ann out so that she could see the child again before death. Hiser said to Ann's sister, "I think I could have done it but I can't remember."

On Monday, about 1:30 p.m., Undersheriff McKeown had appellant come from the courthouse square to McKeown's office. Hiser told the undersheriff that when he and Ann returned to the house in the early morning hours of Saturday, he put the baby on the davenport; Ann went to the bathroom; he went to the garage; later he came back into the house and did not know what had happened. After 15 or 20 minutes, appellant was asked to give an impression of his teeth to a dentist and he was taken to the dentist's office but returned at 5 o'clock, when he was arrested and put in jail. A few minutes later, Ann Huie was released. She was given the opportunity to talk with appellant at the jail at which time defendant told her, "I think I did it." She replied, "I think you did, too."

The baby died at 6:15 p.m. on Monday. An autopsy was conducted upon the deceased child. The doctors testified that the scalp had two small lacerations on the top and near the rear of the head, and brownish discolorations were in the top area of the head; on the left cheek near the mouth was an old bruise; on the right cheek there was a fresh bite mark. There were also two bite marks on the left shoulder and a bite mark on the right back. There were superficial excoriations on the right arm pit and the front chest. There were multiple contusions over the left flank and the posterior rib cage. Internal examination showed subgaleal hemorrhages; both the liver and the spleen were ruptured and had been hemorrhaging. Three ribs were separated from the spine. The principal cause of death was a massive hemorrhage inside the brain cavity. Dr. Faber stated that in his opinion the child had received

multiple injuries that obviously had been inflicted and that the principal cause of death was a severe traumatic injury of some sort, such as a sudden blow or the banging of the head into something immobile. He thought the primary injury was probably not caused by a sharp instrument. The rupture of the spleen and the liver could have occurred from severe blows to the stomach or to the back. Dr. Faber thought a single blow could not have caused both ruptures. Dr. Mason felt that a single blow could have caused both, but it was improbable. It was thought that blows or excessive squeezing could have caused the three ribs to separate from the spinal column. It was felt, with the exception of some older bruises on the body and the head, that all of the injuries occurred within 72 hours of the death, and, consequently, were inflicted after 6:15 p.m., Friday, October 14. This was confirmed in part by the blood in the spinal fluid which indicated that the injury to the head had occurred after 3 or 4 p.m. on Friday, October 14.

On Monday evening, October 17, appellant wrote a letter to Ann from the jail. Undersheriff McKeown made a copy of the letter, censored the original, resealed the envelope and placed the letter in the outgoing mail.

After McKeown read the letter, he had appellant brought into his office, told him the baby was dead and that a tape recorder was recording the interview. This tape was played to the jury. The appellant told of his efforts to control the baby's crying, of some violent debate with Ann; that he had asked Ann to give up the baby; that before the week the baby died, appellant had done most of the taking care of the baby, and that he had called the baby a bastard once or twice during the week; that after they left the coffee shop and went home the baby began to cry; Ann went to the bathroom; he went to the garage and came back, saw the baby in a different position than that in which he had left him, and he then rushed to the hospital with the little boy. At that time, when the sheriff asked him what had happened, he said that perhaps all these things had built up inside of him and he did not want to think that he did it, but he thought so.

Then, on November 1, 1966, Ann Huie wrote a letter to the appellant while in jail. It was read to the jury. Undersheriff McKeown read the letter and handed it to appellant on November 3. In the letter, Ann begged him to tell everything and said that if he really loved her he would tell the truth. McKeown asked Ann if she wanted to see defendant and, when she assented, he took her to the jail where the visitors

and prisoners communicate with each other over an "intercom." Sergeant Durggan listened to the conversation over a monitoring system and testified that defendant asked Ann if she still loved him and she said, "Well, I don't know, Donnie, did you kill the baby?" and, after a hesitation, appellant said, "Well, yes I did." She asked how, and he said "like this." Ann demonstrated to the jury at the trial the motions that appellant made at that time. She asked him about the bites on the child's body, and he said he was just "messing around." Immediately after the interview, Ann reported what appellant had said to the undersheriff. At the trial, defendant testified that he did not strike the baby on the night of the injury, that he was conscious of his behavior at all times and that there were no blackouts.

Defendant's counsel introduced the medical testimony of a Merced psychiatrist, Dr. Brannan, who gave it as his opinion that appellant could not have done the killing because he did not have the capacity to entertain malice toward the baby.

On the appeal, the defendant urges the following points:

1) Remarks of the trial judge deprived defendant of a fair trial;

2) The jury was misinstructed that it could employ defendant's extrajudicial incriminating statement to determine the existence of the corpus delicti;

3) In the evidence context and under section 502, Evidence Code, it was error to fail to instruct the jury of the quantum of proof prerequisite to any consideration of extrajudicial statements of defendant;

4) Failure to inform defendant that he had a right to be promptly arraigned and failure to arraign the defendant without unreasonable delay resulted in the "I must have done it" statement of Hiser, the use of which deprived defendant of a fair trial;

5) If not violative of due process, use of the "I must have done it" statement at trial was erroneous as violative of express judicial policy to scrutinize closely statements so obtained;

6) Use of the confession to Ann Huie, a police agent, and use of "eavesdropped testimony" of Officer Durggan violated the due process right of defendant to have counsel at all stages of the proceedings and the due process right against unreasonable search and seizure;

7) It was error to exclude the tape recordings of the sodium pentothal and hypnotic interviews offered not for

their truth but to lay a foundation for the opinions of Dr. Brannan as to the appellant's mental state;

8) It was gross abuse of discretion to exclude the tapes of the hypnosis and sodium pentothal interviews in view of the trial judge's remarks to the jury disparaging the defense psychiatrist and psychiatric reliance upon such interviews;

9) The verdict of voluntary manslaughter is without evidence to support it;

10) By letter of April 23, 1968, counsel for the defendant added a point to those set forth in his opening brief based upon the case of *Witherspoon* v. *Illinois*, 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]; it was urged as another ground for reversal that the trial was not constitutionally conducted in that there were occasions when a potential juror was excused on the ground that he was so opposed to a death sentence that he would not convict anyone with that penalty attached. There is no virtue in the contention under the authority of *Bumper* v. *North Carolina*, 391 U.S. 543 [20 L.Ed.2d 797, 88 S.Ct. 1788], decided on the same day as the *Witherspoon* case, *supra*, because this jury did not impose a death penalty or even convict this defendant of murder. In fact, defense counsel admitted at the oral argument in this court that the contention on this point was not valid.

Turning to the other nine points urged by the appellant, we first take up the alleged ground that the trial judge deprived the defendant of a fair trial by the remarks which he made during the taking of the evidence. Appellant has set up in his brief a series of 14 statements by the judge and discussions between defense counsel and the judge, which he claims to be error. These are set forth on pages 50-53 of defendant's lengthy brief. The Attorney General discusses and answers each one of the 14 items, using 20 pages of his own brief to do so. To some of the statements there was no objection made at the trial. Some of the remarks by the judge were corrected at the time apparently to the satisfaction of defense counsel. While a jury has the right to rely on the fairness of a judge and upon the correctness of his views and a judge should not make ''discourteous and disparaging remarks'' to defendant's counsel (*People* v. *Mahoney*, 201 Cal. 618, 626-627 [258 P. 607]), we find that no reversible error was committed in these ''exchanges between the court and counsel.'' (*People* v. *Wardwell*, 167 Cal.App.2d 560, 565 [334 P.2d 641]; *People* v. *Sakelaris*, 154 Cal.App.2d 244, 247-248 [315 P.2d 902].) This was a long and in some respects a

difficult case, and the type of trial technique of defense counsel did not offer an easy situation for any judge to handle. Judge Maushart obviously attempted to do the best he could do. After analyzing the 14 items argued by appellant, it seems clear to us that there is no ground for reversal on this point.

The contention by the appellant that "The jury was effectively misinstructed that it could employ defendant's extrajudicial incriminating statement to determine the corpus delicti" is disingenuous and misleading in view of the total transcript in the case. The court concededly gave a proper instruction on this general subject at the time the jury was given the final charge in the case; this was CALJIC Instruction No. 29-C, which stated that "guilt of a defendant in a criminal action cannot lawfully be established solely by evidence of a confession, or of an admission, or of both, made by him on an occasion or occasions other than this trial." And that "[u]nless from evidence independent of any such alleged confessions and admissions, you can and do find that the crime charged to the defendant was committed by someone, you shall not consider for any purpose any evidence of such a confession or admission. That additional evidence, however, need not independently prove, or include proof of, the identity of the person by whom the offense was committed."

What the defense takes to be error on the part of the court, which, as it is claimed, gave the jury a lasting impression contrary to the formal instruction later given to the jury, was occasioned by defense counsel's statement in his argument to the jury as follows: "Now for the purposes of determining whether the corpus delicti has been established or not, you are not to use any incriminating statements that the defendant may have made to anyone. Now, that is the law." At that point, Judge Maushart interrupted by saying: "Well, that is not the law that I am going to give you, Ladies and Gentlemen of the jury, and I am going to instruct you at this time to disregard it because it is not the law as I am going to give it to you and I will give you all the law that pertains to this case."

Counsel for the defendant, as unfortunately too often happens in the arguments of experienced defense attorneys, purported to give the law to the jury. As a matter of fact, the statement made by counsel for the defendant was not accurate in that it did not state the total rule as established by decisions and which is discussed hereinafter, and the court was correct in preventing counsel for the defendant in acting as

the judge and giving to the jury a partial instruction as attempted. The error of defense counsel is further illustrated by the fact that he suggested and requested instructions of the court to the effect that the jury would have been required to find *beyond a reasonable doubt* that the corpus delicti had been established before considering the case as a whole. These instructions were properly refused; the cases from which they were taken (*People* v. *Tapia,* 131 Cal. 647 [63 P. 1001] and *People* v. *Wagner,* 29 Cal.App. 363, 372 [15 P. 649]) were expressly disapproved in the later case of *People* v. *Selby,* 198 Cal. 426, 439 [245 P. 426].　■　It is the law that once a prima facie proof of the corpus delicti is made independently of extrajudicial declarations or statements of the defendant, the statements themselves, afterwards proven, are given full evidentiary effect; in those circumstances, the jury in its determination of whether or not all of the elements of the crime and defendant's connection with it have been established may consider all of the evidence in the record on both subjects (*People* v. *Lopez,* 254 Cal.App.2d 185, 190 [62 Cal. Rptr. 47]). The latter case establishes the principle that only a slight or *prima facie* showing that the crime was committed is required to establish the corpus delicti so that the statements of defendant may be considered.

■　The court properly limited the attempt of defense counsel to influence the jury by stating what he mistakenly thought the rule relative to corpus delicti really held.

■　The allied contention of the appellant that it was error on the part of the court to fail to instruct the jury as to the quantum of proof requisite to any consideration of extrajudicial statements of defendant is, thus also, without substantial merit. The corpus delicti must be proved by evidence independent of the extrajudicial declarations and statements of the defendant. It may be proved inferentially. Such a burden is met, as stated in *People* v. *Jacobson,* 63 Cal.2d 319, 327 [46 Cal.Rptr. 515, 405 P.2d 555] : ". . . by the introduction of evidence which creates a reasonable inference that the death could have been caused by a criminal agency . . . even in the presence of an equally plausible noncriminal explanation of the event."

■　The appellant urges that, because he was not advised by the sheriff's office that he had the right to be taken before a magistrate without unreasonable delay after his arrest and the fact that he was not so taken on the day of his arrest his statement that night to the sheriff's deputy that he must have

committed the murder should not have been allowed in evidence. It should be noted that the objection on this ground was never urged by defense counsel in the trial court. An objection was made by counsel as he stated "for the record" to the admission in evidence of the statements made at 1:30 p.m. on the day of the arrest and at 9:55 p.m. on the same day not on the ground here urged but on the ground that the evidence of waiver by the defendant of the right to counsel was not sufficient. The record shows that no violation of the *Miranda* rule was present; the defendant had been advised on two occasions before the first statement referred to of his constitutional rights as announced in the *Miranda* and other allied cases, and he had acknowledged understanding of those rights, being a person who had received an education up to the eleventh grade of school. The foregoing being correct and well supported by the record, the point cannot be urged for the first time on appeal. (*People* v. *Northrup*, 203 Cal. App.2d 470, 474-475 [21 Cal.Rptr. 448]; *In re Sandel*, 64 Cal.2d 412, 413, fn. 1 [50 Cal.Rptr. 462, 412 P.2d 806].)

However, it should also be noted that even if objection on the ground urged on appeal were available to defendant, the underlying facts do not show a breach of any right of the defendant with respect to timely proceedings before the magistrate. The law is that when an arrest is made without a warrant by a peace officer or a private person the potential defendant ". . . must, without unnecessary delay, be taken before the nearest or most accessible magistrate in the county in which the offense is triable, and a complaint stating the charge against the arrested person must be laid before such magistrate." (See Pen. Code, § 849, subd. (a); Cal. Const., art. I, § 8; Pen. Code, § 145; Pen. Code, § 825.) The record shows that the defendant made a statement to Deputy Sheriff McKeown ending at about 1:30 p.m., and that thereafter the defendant was taken to a dentist to have an impression of his teeth made pursuant to an earlier appointment; thereafter, the defendant was not returned to jail until after 5 p.m. when the formal arrest took place; at that time, the courts were closed. It was not incumbent upon the arresting officer to stop investigating the alleged murder on the afternoon in question. It should be observed generally that there is no authority requiring an arresting officer to notify a potential defendant that he has a right to be taken before a neighboring magistrate without unreasonable delay, and the record shows, it seems to us, that there was no unreasonable delay here in taking him before the justice of the peace.

Pursuing essentially the same point, the defendant in support of his next contention: "If not violative of due process, use of the 'I must have done it' statement at trial was erroneous as violative of express judicial policy to scrutinize closely statements so obtained" the defendant merely cites, without comment, a single case, *People* v. *Powell*, 67 Cal.2d 32, 59-61 [59 Cal.Rptr. 817, 429 P.2d 137]. That case, distinguishable on the facts from the instant litigation, does not furnish any binding authority in application to the present case. In the *Powell* case, the defendants were arrested on a Sunday, but they were not taken before a magistrate and arraigned until the following Wednesday; they were held by the police for three days without advice as to their rights or the appointment of an attorney, and the court commented that this delay in the circumstances violated a fundamental right of the arrested persons and was in disobedience of the law. The judgment in that case was reversed because of the violation of the *Escobedo-Dorado* rules, and the court said that it would not decide at that time whether the circumstances of the late arraignment amounted to such prejudice as to render reversible the denial of defendants' right to prompt arraignment, but that the court did not condone the conduct by the police and any repetition of it would be "closely scrutinized." The elements applicable to the present case were far from a duplication of the facts in the *Powell* case, and, for the reasons already given, we hold that no reversible error was committed in the present litigation on that subject.

Defendant next contends that the use of defendant's confession to his inamorata constituted a reversible error in that Ann Huie, according to defendant, was "a police agent," and because Officer Durggan listened to what was said.

We do not share the defendant's present contention that Ann Huie was a police agent, and it is our view that the confession to her was properly admitted. On November 1, 1966, Ann Huie wrote a letter to defendant dated the same day, saying, "You have never told me whether or not you beat Donovan . . . you know yourself that I never laid a hand on him . . . please tell them the truth about everything." This letter was delivered two days later to defendant by an officer; then Ann Huie visited him in the jail and her conversation with defendant was listened to by Officer Durggan. Ann testified on direct examination that she went to see Hiser, because Officer McKeown told her that defendant would like to see her

and asked her if she wanted to see him. Also, she testified that Officer Durggan drove her to the jail for the visit. Officer Durggan said that he knew there was going to be a conversation between Ann and the defendant, and he testified that he monitored the interview; Ann Huie testified that as soon as their talk ended, she immediately told Officer McKeown about it, and also Officer Durggan. Appellant urges that Ann Huie was a police agent sent there to obtain the confession and that the statements were deliberately elicited after the accusatory stage had been reached and in the absence of counsel, and that defendant's rights were violated, under the cases of *Massiah, Escobedo, Dorado,* and *People* v. *Arguello,* 63 Cal.2d 566, 571-573 [47 Cal.Rptr. 485, 407 P.2d 661]. Appellant also contends that the use of the electronic device violated the due process clause of state and federal Constitutions. Ann Huie testified to the jury concerning what appellant told her when he was in jail. There was no objection made by defendant's attorney at that time, and the Attorney General contends that was a waiver of any claim of error as to Ann's testimony, and, moreover, a waiver of any objection to any other report of the contents of this same conversation if the method of reproducing the conversation was constitutionally permissible. (See *Osborn* v. *United States,* 385 U.S. 323, 326-327 [17 L.Ed.2d 394, 87 S.Ct. 429]; *Lopez* v. *United States,* 373 U.S. 427, 438-440 [10 L.Ed.2d 462, 82 S.Ct. 1381].)

When Ann's evidence was admitted and there was no motion to strike her testimony at any time, that testimony was in for all purposes. Can Durggan's repetition of it be objected to? Defense counsel objected to Durggan's testimony of the conversation which he listened to, saying that Hiser was not told nor warned in any way that his conversation was being monitored and that it was a violation of defendant's right of due process under the Fourteenth Amendment, and the Fifth and Sixth Amendments. The prosecution at the trial gave the judge the citation *People* v. *Ross,* 236 Cal.App.2d 364, 376 [46 Cal.Rptr. 41], holding that the monitoring of a conversation between prisoners in adjoining cells by means of a hidden microphone did not constitute an unlawful invasion of privacy because there is ''no right of privacy in a jail,'' and also *People* v. *Hughes,* 203 Cal.App.2d 598, 601 [21 Cal. Rptr. 668], wherein a tape recording of defendant's conversation with his wife and daughter was obtained without his knowledge by a recording device stored in a wall in the sheriff's office, and the court said that the deception itself did

not render the statement inadmissible for "it was not of a type reasonably likely to procure an untrue statement."

The Attorney General contends that appellant has made no proof that Ann was an undercover police agent; there was testimony that defendant's two brothers had asked Ann to visit him, and the fact that Sergeant Durggan gave Ann a ride to the jail did not establish her as a police agent.

Police may permit outsiders to talk with defendants who are in custody. (See *People* v. *Massie,* 66 Cal.2d 899, 909 [59 Cal.Rptr. 733, 428 P.2d 869]; *People* v. *Martinez,* 239 Cal. App.2d 161, 173-174 [48 Cal.Rptr. 521].) The Attorney General also contends that the case of *Katz* v. *United States,* 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507], cited by defense counsel, concerned a violation of the search and seizure rule and that at the trial appellant made no objection on this ground, but Mr. Davis, defense counsel, made his objection on the ground of trickery and deception. If under the *Katz* case the question is whether a prisoner in a jail visiting room, speaking to a visitor over an intercom system, may expect to have privacy, the Attorney General argues that the cases show that one cannot expect to have such privacy. (See *People* v. *Miller,* 252 Cal.App.2d 877 [60 Cal.Rptr. 791].) In *People* v. *Hays,* 250 Cal.App.2d 96 [58 Cal.Rptr. 241], a woman friend of defendant met with him in a jail room, and the court held that defendant's statement, "Well, I did it," which was recorded by an electronic device, was admissible.

 In connection with the testimony of Dr. Brannan, a Merced psychiatrist called to the stand by the defendant, it is claimed that it was error to exclude the tape recordings of the sodium pentothal and hypnotic interviews conducted with the witness, it being argued that those interviews were offered not for their truth but to lay a foundation for the opinions of Dr. Brannan relative to the mental state of the defendant.

Appellant objects on the ground that the judge thought that as lie detector tests were inadmissible, because unreliable, the results of a hypnotic or sodium pentothal interview had to be inadmissible. In *People* v. *Modesto,* 59 Cal.2d 722, 732-733 [31 Cal.Rptr. 225, 382 P.2d 33] (overruled on another point in *People* v. *Morse,* 60 Cal.2d 631, 649 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810]) the appellate court reversed a lower court because the trial judge did not in fact exercise *any* discretion in excluding the taped hypnotic interview. Appellant contends that it is error to exclude such a tape recording when not offered for the truth of the matter

asserted, citing *People* v. *Cartier,* 51 Cal.2d 590, 601 [335 P.2d 114], and *People* v. *Modesto, supra.* However, Judge Maushart said, "In the discretion of the court it is inadmissible and for that reason I am not going to admit it." It would seem that this remark by the judge indicates that the judge knew it was within his discretion to exclude the tape or to allow it, and that he did exercise his discretion.

Appellant contends it was prejudicial to exclude this tape because of the trial judge's remarks to the jury allegedly disparaging the defense psychiatrist and any reliance upon this type of psychiatric interview. The court said, after defense counsel discussed a proposed instruction on expert opinion, that there was a line in the instruction he was speaking of that would say, ". . . you may ignore entirely the opinion of the expert if the reasons given for it are unsound." The court stated later: "I would like to have some clarification from either one of you now. We know that a lie detector is inadmissible in a court of law. The results of a hypnotic or sodium pentothal interview, it seems to me, should be treated the same way. Let me ask you this, doctor. Is a person under sodium pentothal in his right mind?"

Appellant says that the effect of these statements by the judge was the same as if he had said to the jury, I will let you listen to the opinion of this doctor, but the reasons for his opinions are so unsound that I will not let you hear the interviews upon which they are based, and you must ignore his opinion if his reasons are unsound.

The doctor was not prohibited from testifying as to his reasons for his opinions. In fact, the judge expressly ruled that he could do so. In *People* v. *Chapman,* 261 Cal.App.2d 149, 178 [67 Cal.Rptr. 601], there was a discussion about foundational materials for expert opinions, and the court stated that an "expert witness may express an opinion based on information without regard to the information's admissibility in evidence," and that the "California law gives the trial court discretion to weigh its probative value as a partial basis for the expert's opinion." It is clear from the record that the judge was saying to counsel, "Lie detector tests are not admissible, would you give us some information on this type of testing?" And then, later, he said that he understood that such a tape might be admissible, but, acting within his discretion, he was not allowing it. No error is shown on this point.

■ Finally, appellant contends that the verdict of volun-

tary manslaughter is without evidence to support it. Such a contention is without merit. While the defendant was unquestionably immature and not qualified emotionally or from the standpoint of experience to take care of a baby, his treatment of the 10-month-old child was a departure from an elementary standard of care which anyone with sense would observe. While the record shows that the baby was sick the week before he died: he was vomiting, he was crying, he was upset, supposedly he had a fever, he would not eat properly; it is also proven that during the ten months of the baby's life, defendant had spanked him. scolded him, punished him, and bit him. The baby was seen by a neighbor on the afternoon of the Friday before he was taken to the hospital; she testified that he seemed then to be in good condition. When the couple returned with the baby after their evening out, there is no evidence that the child at that time was unconscious or near death. The record indicates that when Ann went into the bathroom defendant supposedly went out to the garage where the washer was stationed. When the baby was next seen by anybody, he was unconscious and grievously injured to the point that he was near death. The evidence in the case is amply sufficient to support the verdict of voluntary manslaughter. It might be noted in passing that the defendant is lucky that the jury did not convict him of murder and in that his sentence is to the Youth Authority and will be served within a relatively short time. That the gross injuries which the baby received to the spleen, liver, ribs, and the brain unquestionably inflicted by severe beating, caused the death of the infant is a deduction compelled by common sense and the specific evidence. The defendant indicated a complex of motives for what he did and he confessed the crime more than once. There is no error in the record that would warrant a reversal, in our opinion, and the judgment must be approved.

The judgment is affirmed.

Gargano, J., concurred.