STATE of Missouri, Respondent,

v.

George J. PETERS, Appellant.

No. KCD 28134.

Missouri Court of Appeals, Kansas City District.

Dec. 27, 1976.

J. Martin Kerr, Independence, for appellant; Tittle & Kerr, Independence, of counsel.

John C. Danforth, Atty. Gen., Philip M. Koppe, Asst. Atty. Gen., Jefferson City, for respondent.

Before DIXON, P. J., PRITCHARD, C. J., and WASSERSTROM, J.

**415**

PRITCHARD, Chief Judge.

Appellant was found guilty by the verdict of a jury of the commission of the crime of murder in the first degree of Dr. Lynn D. Weller. The court found that appellant was a second offender under the allegations of the information substituted for the indictment of a grand jury, and sentenced him to life imprisonment in the Department of Corrections.

There are two dispositive issues. The first is the admission of incriminating evidence of a taped conversation with appellant, while he was in jail awaiting trial, and witness Lila Joyce Meek, who had a "bug" in her hair at the time, which evidence is contended to be inadmissible by appellant as being an infringement of his Sixth Amendment right to assistance of counsel under *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). The second is the contended error in the failure of the trial court to give the mandatorily required additional instructions on murder in the second degree and manslaughter under MAI–CR 6.02, Note 6, which was effective March 1, 1975, this case having been tried beginning May 5, 1975. As hereinafter developed, the determination of these issues require reversal and remand of the case for new trial.

The facts are these: Appellant was charged with murder in the first degree of one Lynn D. Weller on September 17, 1973. On November 14, 1974, appellant was arraigned and entered his plea of not guilty. On November 20, 1974, appellant's then counsel, the public defender, filed a request for discovery, which among other things, asked for written or recorded statements of appellant. Upon a finding, December 30, 1974, that appellant was not then an indigent person, the public defender was relieved and appellant's present counsel entered his appearance on January 6, 1975. On March 18, 1975, he filed another request for discovery of recordings, and on May 5, 1975, he filed a pre-trial motion to suppress evidence of oral statements, admissions of confessions made by appellant in the Jack-

son County jail to Joyce Meek, which motion was overruled. An objection made at trial to the evidence was overruled, and the point is preserved by the motion for new trial.

On September 17, 1973, Mary Graves was and had been for some time the girl friend of Dr. Lynn Weller, for whom she worked in the Medical Center for Women. A month before he had told her "that the police had reason to believe that there was a threat on his life, that a so-called contract had been issued and that he was directed, naturally, to be extremely careful * *." On September 17th, after pre-arrangement, Mary drove to Weller's home at 7320 Manchester, arriving about 10:30 p. m. The light was on in the garage, so she walked in, but Weller was not there. She knocked on the house door in the garage, but got no response, and as she turned to leave she saw two men approaching, one of whom, McGuire, had a shotgun pointed at her. McGuire was the man of whom Dr. Weller had shown her a picture, which picture had been given him by the police. The men followed Mary around the house to the front door where she knocked. Weller opened the door, and the man with the shotgun levelled it over Mary's shoulder at Weller, and pushed their way inside. Weller grabbed the shotgun by its barrel, and during that struggle the other man shot Weller with a pistol. At this particular time the two men had netting types of masks on. Mary was ordered to lie on the floor in a room next to the kitchen and one of the men walked past her and struck her on the back of the head. The man walked back to the kitchen and there was a few seconds later a very loud blast. Mary had barricaded herself in other parts of the house and later reported the occurrence to the police from a next door neighbor's home. The police came and she gave a detective a statement. She identified McGuire the next day in a line-up, and the day after that she was shown some photographs by Officer Cool, and she was able to pick out appellant in two photographs as being the man with McGuire on the night in

question. She also made an in-court identification of appellant as being that man.

There was evidence that the cause of Weller's death was a shotgun wound to the head. An expended shotgun shell found at the scene of the killing was connected with a riot shotgun which had belonged to appellant prior to the shooting.

Joyce Meek, one time married to appellant, testified that after he was arrested he started calling her place of residence, 10 or 15 times. She then went to the police department and tried to have the harassment stopped because it was making a very shaky situation with her new marriage. Prior to that time, during the telephone conversations, appellant told Joyce, "Joyce, there's no way that nobody can identify me because I had a mask over my face"; and concerning McGuire, "A Yes, sir, he told me that there was no way that Pat McGuire would squeal on him."

It is obvious from the foregoing evidence that a submissible case of murder in the first degree was made against appellant: The identification of appellant as being at the scene of the killing and being one of Weller's assailants with the pistol; the connection of the shotgun murder weapon with appellant; and his voluntary statements to Joyce on the telephone incriminating him.

The state, however, went further than was needed, and committed reversible error. After Joyce Meek went to the police department about appellant's telephone calls to her, she went to the office of an assistant prosecuting attorney, the date being November 26, 1974. With Joyce were Detective Clark Hamilton, Sergeant Trollope, Policewoman Elaine Dalton, and the assistant prosecuting attorney. Joyce mentioned that she had been in contact with appellant and he requested her to go to the county jail to talk with him. It was decided that Joyce was to go up to the jail "bugged" and record conversations with appellant. Joyce consented to have a microphone placed on her person, in her hair, and it was put there by the police. She then went to the jail and appellant's conversation with her was re-

corded and later transcribed. Joyce listened to the recordings and made corrections on the transcription with the assistance of one Mary Jo Peters who had at one time been married to appellant. Both the transcription and the tape were introduced into evidence and the jury listened to the tape recording. At the time of the meeting between Joyce and according to the assistant prosecuting attorney, "A We asked her to be as calm as could be, not to, so to speak, tip her hand, show her hand; but that if, during the course of the conversation, certain incriminating statements were offered, not to feel ashamed or be afraid to go further into the details. Q Was she instructed by yourself, or anyone, to ask any certain kind of questions? A Well, I think that we may have mentioned to her to not be afraid to ask about the crime." Joyce's testimony, on pretrial motion to suppress, was: "Q And did they give you any specific instructions about what questions to ask, or what to do, or did you just go up there and let Mr. Peters say whatever he wanted to say? [Objection, overruled.] Q (By Mr. Humphrey) What was said to you? A What was said? They asked me if while I was up there, if I would ask George if he did commit the murder, something about a safety deposit box there in Clinton, I believe it was, that he had told me about over the phone, etc. * * *." The portions of the transcript which were read to the jury in connection with Joyce's testimony were these: "Q (By Mr. Humphrey) Mrs. Meek, I want to ask you if you remember this being on the tape where it says 'female'. Is that your voice? A Yes, sir, it is. Q And would you read the question where it says 'female' there in that transcript? A 'Were you where they say you were at or were you? You didn't do it?' * * * Q (By Mr. Humphrey) And the answer was, 'Don't ask questions now. When I get out I'll tell you the whole story. What you don't know now won't hurt you. Understand?' A 'In other words, it's more like saying well, I did it, but shut up. I don't know.' Q Who said that? A I said that. Q And the male voice, this is George Peters, says, 'Yes, I'm not saying yes and

I'm not saying no. I'm just saying what you don't know right now won't hurt you. But just take it this way, I'm changed.' Go ahead. A 'Honey, I can't believe it, I just can't.' Q 'Never mind.' A 'I say well he probably did, you know.' Q And then what did you say? A That was my statement. 'Is this the first killing?' Q And George Peters answered, 'It's not the first.' A 'Thanks a lot, friend.' Q 'I'm just telling you. It's not the first.' A 'Will it be the last?' Q 'Oh, yeah, my partner's in jail now. So we haven't taken any business off in quite a while.' Reading now from page 7 did George Peters say, 'I gotta come up with two grand as soon as I get out. It will take 24 hours to get it here. As soon as I take a trip to Columbia'? And what did you say? A 'Columbia or Clinton?' Q And George Peters said, 'Clinton. Columbia.' A 'Is there anything you should want maybe I should know?' Q 'No way you can get it. It's in a safe deposit box. It was already prearranged before anything ever happened. Nobody could get to it. It's not in my name. This guy, the President of the bank down there is a friend of mine and Pat's.' A 'Who?' Q 'Of mine and Pat's, Pat McGuire.' A 'Oh, okay.' Q 'And this is actually in the safety deposit box in his own name.' A 'Where's the key?' Q 'That's taken care of, too.' On page 10 of the transcript. A 'When you get out will you straighten up or what?' Q 'Oh, yeah, I'm not bad.' A 'Will it be nice and legal all the way?' Q 'Yes.' A 'Now I mean that, George.' Q 'Joyce, I have a couple of commitments I have to straighten out. I have to straighten this out. I work for some people. I told you I've changed. I work for some people and I have to straighten this thing out. Understand? I can't get ahold of these people up here you know. I have some money when I get out, waiting for me too. When I get out, to work for some people.' A 'What's the chances of getting caught after you've been out a while? There's no way, right?' Q 'Yeah, there's no chance. I'm just saying I work for some people and I have to tell them I'm going to cool it.' A 'If you think anything of me, I mean, like I'm not get-

ting any younger.' Q 'Joyce, I work for some people. You just don't tell a man I quit. You understand?' A 'You should never have gotten tied up with them to start with.' Q 'Well, the money is fantastic. The money is fantastic.' A 'Is it worth life in prison for?' Q 'I'm not planning on it 'cause there would be no witness again.' "

The indictment here was filed February 15, 1974. On November 14, 1974, appellant appeared in person, *and by attorney*, the public defender, was then arraigned and entered a plea of not guilty to the charge of murder in the first degree. Bail was set in the amount of $150,000.00. This was 12 days before Joyce Meek went to the Jackson County jail with the "bug" in her hair, with police and prosecutorial help to record conversations she had with appellant.

The facts in *Massiah,* supra, were these: Massiah was indicted for violating federal narcotics laws. He retained a lawyer, pleaded not guilty, and was released on bail. A co-indictee, Colson, a few days later decided to cooperate with government agents, and he permitted the agents to install a radio transmitter under the front seat of his automobile, by which agent Murphy could overhear conversations from some distance away. Thereafter, Colson and Massiah had a lengthy incriminating conversation in the car which was overheard by agent Murphy, who testified to it at trial. The court reversed the conviction, relying in part upon its earlier decision in *Spano v. New York,* 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959), where defendant, having been indicted for first degree murder, had a confession elicited from him which was admitted into evidence against him. In *Spano,* it was said by the *Massiah* court, the defendant's conviction could not stand under the Fourteenth Amendment, although the court's opinion relied upon the totality of the circumstances under which the confession had been obtained, four concurring Justices pointed out that reversal was required on the sole and specific ground that the confession had been deliberately elicited by the police after defendant had been in-

dicted and at a time when he was clearly entitled to a lawyer's help, paraphrasing and quoting *Spano,* supra, 377 U.S. at page 204, 84 S.Ct. at page 1202, "[A] Constitution which guarantees a defendant the aid of counsel at such a trial could surely vouchsafe no less to an indicted defendant under interrogation by the police in a completely extrajudicial proceeding. Anything less, it was said, might deny defendant 'effective representation by counsel at the only stage when legal aid and advice would help him.' " The Court went on to quote from *People v. Waterman,* 9 N.Y.2d 561, 216 N.Y. S.2d 70, 175 N.E.2d 445, 448 (N.Y.1961), " 'Any secret interrogation of the defendant, from and after the finding of the indictment, without the protection afforded by the presence of counsel, contravenes the basic dictates of fairness in the conduct of criminal causes and the fundamental rights of persons charged with crime.' "

In *Massiah,* the listening device was placed under the seat of the cooperating individual's car, Colson's, by government agent Murphy, who listened in to the several incriminating statements made by Massiah. In this case the state contends that at no time was Joyce Meek acting as a government agent, "and was not acting as such when the appellant requested that she visit him at the Jackson County Jail." The contention enclosed in quotes is true, but it does not follow that Joyce did not thereafter become a "government agent" when she acceded to having the "bug" put in her hair and was told by the assistant prosecuting attorney to be as calm as could be, not to speak or show her hand; "but that if, during the course of the conversation, certain incriminating statements were offered, not to feel ashamed or be afraid to go further into details. Q Was she instructed by yourself, or anyone, to ask any certain kind of questions? A Well, I think that we may have mentioned to her not to be afraid to ask about the crime." Thus, it is apparent that the police and prosecutorial participation in this case was more extensive than that in *Massiah,* where the government agent, Murphy, merely listened in to the incriminating statements by prearrange-

ment with Colson (nothing appears in the *Massiah* opinion which indicates that any type of questions were suggested to be used by Colson). It is clear from these facts, and the nature of some of the incriminating, taped statements of appellant, that his Sixth Amendment right to assistance of counsel was violated, and the evidence of the taped conversations while he was in jail should have been excluded. The principle of *Massiah* has not been altered, but was reaffirmed in *Beatty v. United States*, 389 U.S. 45, 88 S.Ct. 234, 19 L.Ed.2d 48 (1967), which reversed the holding of the Fifth Circuit Court of Appeals in *Beatty v. United States*, 377 F.2d 181 (C.A.5th 1967). *Massiah* has been followed in this state, *State v. Witt*, 422 S.W.2d 304, 308, 309 (Mo.1967), citing and quoting also *State v. Herman*, 3 Ariz.App. 323, 414 P.2d 172, 175–176 (1966). [It must be mentioned that the portion of the Herman decision holding that statements elicited from a defendant, without the presence or approval of defendant's counsel, are inadmissible as a matter of law, was expressly overruled in *State ex rel. Berger v. Superior Court*, 105 Ariz. 553, 468 P.2d 580, 581 (1970).] See also *State v. White*, 494 S.W.2d 687, 692 (Mo.App.1973); *United States v. Thomas*, 474 F.2d 110, 113 (C.A.10th 1973); *Clifton v. United States*, 341 F.2d 649 (C.A.5th 1965); *United States v. Anderson*, 523 F.2d 1192 (C.A.5th 1975); *United States v. Merritts*, 387 F.Supp. 807 (E.D.Ill.1975), reversed in part, 527 F.2d 713 (C.A.7th 1975). Without doubt, assistance of counsel under the Sixth Amendment is binding upon the states under the Fourteenth Amendment. *Gideon v. Wainwright*, 372 U.S. 335, 342, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); 21 Am.Jur.2d, Criminal Law, § 319, p. 347.

The state contends that the evidence of the tape recordings and the testimony in regard thereto, being merely cumulative to other strong evidence of appellant's guilt, was harmless beyond a reasonable doubt. As set out in detail above, the evidence admitted bore directly upon appellant's guilt, being corroborative of other eyewitness testimony of his presence, armed, at the scene and his participation in the homicide, and Joyce's testimony of telephone conversations of appellant's admissions. This court cannot say that the tapes and testimony about them did not affect the jury's assessment of the case against appellant. This court cannot, therefore, declare the error harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *State v. Wynne*, 353 Mo. 276, 182 S.W.2d 294, 300 (1944).

The state cites and relies on *People v. Hiser*, 267 Cal.App.2d 47, 72 Cal.Rptr. 906 (1968), but that case may be distinguished in its holding that defendant's inamorata was not a police agent, because there was no evidence that she and the officer, who drove her to the jail, agreed to monitor conversations with defendant before the visit, or that the inamorata in any way knew that the conversations would be monitored. Her testimony at trial was admitted without objection and without motion to strike. In any event, in view of the *Witt* case, and others, supra, following *Massiah*, this court chooses not to adopt the end result of the *Hiser* case. On retrial of this case, the evidence of the tape recording, or any other testimony alluding thereto, should be excluded.

■ Also upon new trial, instructions should be given, as mandated by MAI–CR 6.02, note 6, both upon the subjects of second degree murder and manslaughter.

By their briefing, the parties are aware of other issues presented which issues may not arise on new trial, and the same are not ruled at this time.

The judgment is reversed and the case is remanded for new trial.

All concur.