[Crim. No. 6287.   In Bank.   Feb. 3, 1959.]

THE PEOPLE, Respondent, v. VENDER LEE DUNCAN,
Appellant.

Edward T. Mancuso, Public Defender (San Francisco), and Waldo F. Postel, Jr., Assistant Public Defender, for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Chief Assistant Attorney General, John S. McInerny, Deputy Attorney General, Thomas C. Lynch, District Attorney (San Francisco), and Walter H. Giubbini, Assistant District Attorney, for Respondent.

GIBSON, C. J.—A jury found defendant guilty of two counts of first degree murder. In separate proceedings the penalty was fixed at death for each count, and defendant was found to have been sane when the offenses were committed. (Pen. Code, § 190.1.) His motions for a new trial and modification of the verdicts were denied, and he was sentenced to death. This appeal comes before us automatically. (Pen. Code, § 1239, subd. (b).)

Two police officers found the dead body of Elizabeth Manning on September 4, 1955, in her apartment on Webster Street near Fulton Street in San Francisco. About $65 in currency and some silver were missing. Mrs. Manning, who was about 75 years old, had been beaten about the head, face, neck and chest, a number of bones had been fractured, there were injuries to her genitalia, and spermatozoa were present in her vagina. The autopsy surgeon testified that Mrs. Manning's death was due to strangulation.

Mrs. Ada Romig, an elderly woman, was found on April 5, 1957, in a vacant lot which ran from Fulton to Grove Street between Fillmore and Webster Streets in San Francisco. She had been attacked at the Grove Street end of the lot and dragged through it to where she was found near Fulton. There were extensive injuries about her head, face and neck. A small abrasion was found on the inside of the left thigh, and the opening to the vagina was badly bruised and bleeding. She died on May 9, 1957, as a result of the injuries. Officers searched the lot and found articles of her clothing in several places, but they did not find her purse.

Approximately three weeks after the attack on Mrs. Romig, police officers observed defendant and another man some time after midnight on the corner of Octavia and McAllister Streets, four and a half blocks from the lot where the attack occurred. Defendant and the other man made a number of starts in different directions but each time went back to the corner. When defendant saw the officers he turned around and started to walk in another direction. The officers approached defendant, saw the blade of a table knife protruding from his pocket, and took the knife from him. They questioned him as to his reason for being in the area, and he gave several conflicting stories. He was placed under arrest as a vagrant, and, when he was searched, the officers found a 12-inch pipe with an elbow on it inside the front of his trousers.

In November 1957, while serving a county jail sentence for another offense, defendant asked to speak to members of the homicide department. He told the officers that in the early part of September 1955 he had killed a woman with whom he had been having an ''affair'' and that he had taken two watches and $35 from her.

The police officers asked defendant to show them where the crime had taken place, and he directed them to 804 Webster Street, the location of Mrs. Manning's apartment. Upon arriving there he said that his earlier statement was false in some respects, that he wanted to correct it, that he had never seen Mrs. Manning before he entered her apartment, that she awoke and started to scream as he was taking about $200 from a drawer, that he hit her numerous times and started to choke her, that he then took about $30 from her purse, and that after she again cried out he raped and choked her. At the time the police officers discovered Mrs. Manning's body the front and rear doors of the apartment

were locked, and the only apparent method of entry was through an unlatched window. When asked how he entered the apartment, defendant led the officers to a garbage pail, which was under the steps of the adjoining home and not visible from the street, and showed them how he had placed it under the window and climbed into the room. He also said that he had wrapped his hands in handkerchiefs so that he would leave no fingerprints.

A few days later defendant told police officers he had killed another woman in a lot on Fillmore Street, and he directed them to the place where Mrs. Romig had been attacked. He told the officers that he accosted Mrs. Romig at the corner of Grove and Webster Streets and, after threatening her with a knife, forced her into the lot where he shoved her to the ground, choked her with a piece of wire, struck her repeatedly over the head with a piece of pipe, a cement brick and other things, and then began an act of intercourse. Due to light in the area and the sound of voices he became afraid that someone might see or hear him, and he dragged her to an opening between a wall and a shed. Mrs. Romig began to moan, so he dragged her farther into the lot and again had an act of intercourse but stopped when he was frightened by some noise. He moved her to another portion of the lot and took 50 cents and some codeine from her purse.

Defendant repeated his confessions the next day, and his statements, which were recorded and which the jury heard, were substantially the same as those he had previously given to the police at the scenes of the crimes.

At the trial defendant admitted making the confessions but denied that he had committed either of the crimes and said that he made the confessions because he wanted to die and that he had attempted suicide three times previously. He explained his knowledge of the crimes by stating that he learned some of the details from newspaper accounts and some from seeing police reports on an occasion when he was arrested in 1956, and that with respect to others he had been prompted by the police when he was taken to the scenes of the crimes. On cross-examination he admitted prior convictions of rape and assault to commit murder.

There is no claim that the evidence is insufficient to support defendant's conviction of the murder of Mrs. Manning.

With respect to the Romig homicide, defendant contends that every element of the corpus delicti, including the degree of the crime, must be established without reference to his

extrajudicial statements, and he asserts that any question of the homicide occurring during the commission of a robbery or rape was raised by his confession and that the People, as a matter of law, established only a murder in the second degree. ▉ It is settled, however, that the corpus delicti in a case involving first degree murder consists of two elements, namely, the death of the victim and the existence of some criminal agency as the cause. (*People* v. *Cullen,* 37 Cal.2d 614, 624-625 [234 P.2d 1] ; *People* v. *Ives,* 17 Cal.2d 459, 463-464 [110 P.2d 408].) ▉ Once prima facie proof of the corpus delicti is made, the extrajudicial statements, admissions, and confessions of a defendant may be considered in determining whether all the elements of the crime have been established. (*People* v. *McMonigle,* 29 Cal.2d 730, 738-740 [177 P.2d 745].) It is clear from the evidence other than the confessions that Mrs. Romig met her death through a criminal agency. ▉ Moreover, the circumstantial evidence, without the confessions, is sufficient to establish the commission of first degree murder, since it supports an inference that Mrs. Romig was killed in the perpetration of, or attempt to perpetrate, rape. (Pen. Code, § 189; *cf. People* v. *Sameniego,* 118 Cal.App. 165, 170-171 [4 P.2d 809, 5 P.2d 653].)

▉ The 12-inch pipe taken from defendant at the time he was arrested as a vagrant was relevant in connection with his statement that he had struck Mrs. Romig with a piece of pipe. ▉ An objection that the pipe was obtained as the result of an unlawful search and seizure was properly overruled. In view of the circumstances related above, the officers were clearly justified in questioning and searching defendant.

▉ Defendant contends that the trial court erroneously rejected his offer to prove that in March 1958, when he was in custody, a third woman was murdered in San Francisco, that she had been strangled, and that she had suffered injuries similar to those inflicted upon Mrs. Manning and Mrs. Romig. He argues that the offered evidence would have tended to show that the same person committed all the crimes and that, since defendant could not have committed the third murder, he was innocent. However, the facts which defendant sought to prove are at best too remotely connected with the issues of this case to show that the trial court erred in refusing the offer.

▉ After the jurors had been deliberating the issue of sanity for several hours they returned to the courtroom and

asked whether, if defendant was sane at the inception of the crime, they were to infer from this that he was legally sane throughout the crime. In reply the judge repeated instructions previously given on sanity, including directions that the jury must determine whether defendant was sane or insane at the time of the commission of the offenses and ascertain the condition of his mind at the "precise times" of the criminal conduct of which he "has been found guilty." The judge remarked that he realized it would be difficult for the jurors to determine the mental condition of a person at any definite period during the commission of a crime, and defendant asserts that this remark took from the jury the right to find that he became legally insane before committing murder or rape if the jury found that he was sane when he commenced the crime of burglary or assault and battery in Mrs. Manning's apartment or when he forced Mrs. Romig into the lot. The instructions informed the jury that its duty was to determine defendant's mental condition at the time of the consummation of the crimes of which he was convicted, namely, the murders, and there is no sound basis for concluding that the remark in question was understood as anything more than a recognition that the performance of that duty would be difficult.

There is no merit in defendant's contentions that section 190.1 of the Penal Code, adopted in 1957, which provides for separate trials of the issues of guilt, penalty, and sanity, is unconstitutional. (*People* v. *Feldkamp, ante,* p. 237 [331 P.2d 632]; *People* v. *Ward,* 50 Cal.2d 702 [328 P.2d 777]; *cf. People* v. *Cordova,* 14 Cal.2d 308, 309 et seq. [94 P.2d 40].)

The trial court properly denied defendant's request, made after the fixing of the death penalty and prior to the commencement of the sanity proceeding, that he be permitted to conduct further *voir dire* examination of the jurors to determine whether they had become biased as a result of the fixing of that penalty. Section 190.1 of the Penal Code provides that, where the defendant is convicted by a jury of an offense which may involve the death penalty, the same jury shall determine the issues of penalty and insanity "unless, for good cause shown, the court discharges that jury. . . ." The section clearly contemplates that a jury, after fixing the penalty at death, may be called upon to determine the question of insanity and that the imposition of the death penalty, without more, does not constitute bias on the part of the jurors or good cause for discharge. Defendant con-

ceded to the trial court that he had no information in his possession indicating disqualification of any of the jurors, and he admitted that he had been given opportunity before the jurors were sworn to examine them as to whether or not their judgment on the issue of sanity would be affected by the fixing of the death penalty. In an analogous situation involving the death penalty prior to the enactment of section 190.1, it was held that the trial court was not required to let the defendant re-examine the jurors for cause after trial of the general issue and before the proceeding to determine sanity. (*People* v. *Goodwin,* 9 Cal.2d 711, 715 [72 P.2d 551] ; see *People* v. *Wein,* 50 Cal.2d 383, 408 [326 P.2d 457] ; *cf. People* v. *Woods,* 19 Cal.App.2d 556, 558 [65 P.2d 940] ; *People* v. *Foster,* 3 Cal.App.2d 35, 39-40 [39 P.2d 271] ; *People* v. *Davis,* 94 Cal.App. 192, 197 [270 P. 715].)

There was no error in permitting the jury to separate after it returned the verdicts of guilty of murder of the first degree. Section 190.1 of the Penal Code, as we have seen, provides for separate proceedings on the issues of guilt, penalty, and sanity, and, under certain circumstances, it permits the hearing of these issues by different juries. The trial of the issues of penalty and sanity may take several days, and there does not seem to be any greater reason to prevent the jury from separating prior to or during these proceedings than during the trial of the issue of guilt.

The verdicts relative to penalty and to sanity were not rendered invalid by the fact that they were not signed by the foreman who signed the verdicts of guilty but, instead, were signed by different foremen. No reason appears why the jury should not be permitted to choose different foremen for the separate proceedings upon the issues of guilt, penalty, and sanity.

The judgment and the order denying a new trial are affirmed.

Shenk, J., Carter, J., Traynor, J., Schauer, J., Spence, J., and McComb, J., concurred.