**UNITED STATES**

v.

**Charles W. ELMORE, 252 19 7604, Boatswain's Mate Third Class (E–4), U.S. Navy.**

**NMCM 88 4769.**

U.S. Navy–Marine Corps Court of Military Review.

Sentence Adjudged 6 Aug. 1988.

Decided 1 Aug. 1990.

Jack B. Zimmermann, Esq., Civilian Defense Counsel.

Capt. M.K. Schaller, USMCR, Appellate Defense Counsel.

LT J.L. Staley, JAGC, USNR, Appellate Defense Counsel.

LT William R. Sprance, JAGC, USNR, Appellate Government Counsel.

Before ALBERTSON, WILLEVER and JONES, JJ.

ALBERTSON, Senior Judge:

Contrary to his pleas, appellant was convicted by general court-martial composed of officer members of premeditated murder in violation of Article 118, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 918. He was sentenced to life imprisonment, total forfeiture of pay and allowances, reduction to pay-grade E–1, and a dishonorable discharge. The convening authority approved the sentence adjudged.

Before this Court, appellant asserts eight assignments of error:

I. THE FINDINGS OF GUILTY SHOULD BE SET ASIDE BECAUSE THE EVIDENCE IS INSUFFICIENT TO CONVINCE THIS HONORABLE COURT AS A FACT FINDER OF GUILT BEYOND A REASONABLE DOUBT.

II. THE FINDINGS OF GUILTY SHOULD BE SET ASIDE BECAUSE THE EVIDENCE WAS LEGALLY INSUFFICIENT TO SUSTAIN FINDINGS OF GUILTY.

III. APPELLANT'S RIGHTS TO CONFRONTATION OF WITNESSES, DUE PROCESS OF LAW, AND A FAIR TRIAL WERE VIOLATED WHEN THE MILITARY JUDGE ERRONEOUSLY ADMITTED HEARSAY EVIDENCE OF ORAL STATEMENTS PURPORTEDLY MADE BY THE ALLEGED VICTIM.

IV. APPELLANT'S RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AMENDMENT WAS VIOLATED BECAUSE HIS FOREIGN CIVILIAN DEFENSE COUNSEL

FAILED TO OBJECT TO THE ADMIS-
SION OF DAMAGING HEARSAY
STATEMENTS AND SPECIFIC IN-
STANCES OF MISCONDUCT WHICH
WERE PREJUDICIAL AND IRRELE-
VANT.

V. THE FINDINGS OF GUILTY
SHOULD BE SET ASIDE BECAUSE
THE MEMBERS WERE IMPROPERLY
INFORMED THAT THE APPELLANT
HAD INVOKED HIS FIFTH AMEND-
MENT RIGHT AGAINST SELF–IN-
CRIMINATION DURING CUSTODIAL
INTERROGATION.

VI. THE APPELLANT'S RIGHTS TO
CONFRONTATION OF WITNESSES,
DUE PROCESS OF LAW, AND A FAIR
TRIAL WERE VIOLATED WHEN A
CRUCIAL PROSECUTION EXPERT
WITNESS ENGAGED IN CONVERSA-
TION AND DINED WITH THE MEM-
BERS OF THE COURT THE FIRST
NIGHT OF TRIAL AND ATE BREAK-
FAST WITH THEM THE SECOND
DAY OF TRIAL.

VII. THE FINDINGS OF GUILTY
SHOULD BE SET ASIDE BECAUSE
THE MILITARY JUDGE ERRED TO
THE SUBSTANTIAL PREJUDICE OF
THE APPELLANT BY ERRONEOUS-
LY INSTRUCTING THE MEMBERS
ON THE ELEMENTS OF ATTEMPTED
MURDER.

VIII. THE APPELLANT'S RIGHTS
TO DUE PROCESS OF LAW AND PRE-
TRIAL DISCOVERY UNDER THE
UCMJ WERE VIOLATED BY THE
PROSECUTOR'S SUPPRESSION OF
IMPEACHMENT EVIDENCE.

He also petitions for a new trial. The basis for the petition is post-trial discovered evidence. In support of his petition, appellant submitted an affidavit of an Australian farmer swearing that he had seen a woman he believed to be the murder victim in Perth on 23 March, seven days after her alleged death at the hands of appellant. At trial Sarkis Yazmadjiam, an itinerant, claimed that he saw the victim on the same day, 23 March, in the same city, Perth, at about the same location, a street near the train station. Appellant contends that this newly discovered testimony, coupled with that of Mr. Yazmadjiam, would have produced a substantially more favorable result given the Government's lack of proof of *corpus delicti*, and its completely circumstantial case founded upon inadmissible hearsay. We reject appellant's assignments of error and deny his petition for new trial. Our reasons are set forth below.

## BACKGROUND

Boatswain's Mate Third Class (BM3) Elmore was a member of the station boat crew at Naval Station Harold E. Holt, when he was convicted of murdering his wife, Bella, a Filipino, at Exmouth, Australia, during the early morning hours of 17 March 1988. Appellant and Bella had lived together for 3 years and had been married for 6 months in March 1988. At trial the evidence revealed that the appellant and his wife had constant arguments over money and a history of relatively minor mutual spousal abuse. The testimony included statements Bella made to her friends concerning her dissatisfaction with the marriage, maltreatment by appellant, threats by him to harm her, and fears for her personal safety comprising those hearsay statements objected to by the defense in assignments of error III and IV. The testimony also included statements appellant had expressed to Michael and Stephanie Parsons, his best friends, that he wanted to divorce Bella, and that his marriage to her was a mistake. While drunk, he had "jokingly" stated to Michael Parsons, on several different occasions, that he "wanted to cut Bella up and use her for shark bait." The Parsons testified about a specific instance where appellant struck Bella, which caused a lump to raise on her head and blood to come from her mouth. Further, appellant and Bella had had a particularly vocal, crude, and public argument at the enlisted club on 4 March. Finally, a Chief Tope, who drove appellant home the night of the 4 March argument, testified that appellant was upset, cried, and stated that his marriage was over because Bella was off "f … someone else."

On the evening of 16 March, appellant and his wife, with their friends, bowled and

then went to the enlisted club for drinks. After drinking heavily, appellant and Bella were seen to leave the club together. Appellant later told the police authorities that he and Bella had returned home around 2300. Appellant has told no less than four different stories as to what happened later that night. In version 1, which appellant told over the next two days to the Parsons, his division officer LT Sullivan, Petty Officer Smith, and Australian police authorities, he stated that he went to bed upon returning home and that Bella was gone when he awakened at 0530 the next morning, 17 March 1988. In version 2 appellant stated that he and his wife returned home that evening, argued heatedly over money, and decided to go for a drive to help resolve their differences. After stopping the car (the only white hatchback Ford Mustang in Western Australia) off-base, Bella got out of the car to walk. Appellant drove off leaving his wife but later picked her up. They then drove to the Navy pier, 10 miles from their house. Appellant stated that upon arriving at the pier between 0100 and 0130 they continued to argue. Appellant, agitated, left Bella at the pier and returned home. Appellant stated that he next saw Bella later that morning while he and Parsons were driving to work, though he neither told Parsons of leaving Bella at the pier nor did he stop to pick her up. When Detective Sergeant Balchin questioned appellant concerning this version, appellant recanted and told version 3, that is, he and Bella entered the boathouse near the pier to get something to drink, continued to argue, whereupon appellant told her to take her belongings and leave their house. Bella then walked the nearly one-fourth of a mile length of the pier, headed to the northwest corner of the pier to a point where there was a gap in the rail. Appellant followed her and as he approached her, called to her and she either tripped or stumbled, and fell off or over the pier railing into the Gulf of Exmouth, where tides were running at 5–6 knots heading out toward the Indian Ocean and the water is 45 feet deep. He went home, went to bed, got up the next morning and went to PT formation. The 4th version is appellant's trial testimony, which embellishes the 3rd version. Appellant testified that after arriving at the boathouse, he and Bella returned to his car and drove several miles to the lighthouse, where they talked for 2 hours, then returned to the pier. He testified that after Bella fell into the water, he spent between 30 to 45 minutes searching the area around the pier and the catwalks beneath it. He also testified that the pier was well lighted at night, he never used the emergency phone on the end of the pier to call for assistance, admitted to never throwing a life buoy to assist her (because he states he never saw her), and not finding her, returned home, went to bed, awakened the next morning and went to work. He stated to Detective Sergeant Balchin, and testified, that he thought Bella could swim to shore and walk barefooted the 10 miles back to their house.

It was not until the following afternoon that appellant began to search for Bella, going first to the Parsons' home, and then to several other of Bella's friends' houses, asking if they had seen her because when he had wakened that morning he found she was gone. (Appellant explained that he made inquiries about her disappearance with her friends because Bella had previously spent the night at the houses of friends when she and appellant were not getting along.) From 18–27 March, appellant denied knowledge of Bella's whereabouts, and participated in searches for her in the area surrounding his house. On 19 March, while various people were searching the areas immediately adjacent to his house, he borrowed the 4–wheel drive vehicle of UT2 Kanachki and drove to the beach area, looking for Bella. He took no one with him and told no one what he was going to do. It was not until questioned by Detective Sergeant Balchin on 27 March that he recanted his original story (version 1) concerning Bella's disappearance.

The evidence of record reveals that as of the date of trial Bella Elmore had not been seen by appellant or their friends since the evening of 16 March 1988. No body or traces thereof had been found. Also proven was the fact that Bella had not been

listed as a passenger on the passenger manifests of the Australian bus company or airlines, nor at the Military Airlift Command terminal. Although an identification card is not required for domestic transportation, employees of the bus and airline terminals testified they did not remember seeing her or anyone resembling her after 16 March. Finally, the victim's military dependent identification card and resident alien card were found in the Elmore home and appellant gave the police her passport.

We will address the assignment dealing with legal sufficiency of the evidence first because only after finding legal sufficiency, must we determine factual sufficiency, *i.e.*, are we convinced beyond a reasonable doubt of appellant's guilt. *See United States v. Turner*, 25 M.J. 324 (C.M.A.1987); Article 66(c), UCMJ, 10 U.S.C. § 866(c). "The test for [legal sufficiency] is whether, considering the evidence in the light most favorable to the prosecution, a reasonable fact-finder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. at 324 (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 569 (1979)). Appellant claimed rather succinctly in oral argument before us that he was convicted solely because he was a liar. We must admit that such a claim has given us pause because we like other courts are committed to the doctrine that

> a defendant may not be convicted on conjectures, however shrewd, on suspicions, however justified, on probabilities, however strong, but only upon evidence which establishes guilt beyond reasonable doubt; that is, upon proof such as to logically compel the conviction that the charge is true. (Citations omitted).

*State v. Riggs*, 61 Mont. 25, 201 P. 272, 280 (1921). That pause, however, has in turn given us the time and opportunity to digest the few recorded cases addressing murder convictions based entirely on circumstantial evidence, most particularly those involving proof of *corpus delicti* and the significance of a defendant's inconsistent or contradictory statements, admissions or confessions, that served as the only direct evidence presented by the prosecution to prove its case against the defendant.

In a murder prosecution where there is no body or traces of a body, the Government must establish the *corpus delicti*, which consists of evidence proving two elements: that the alleged victim is dead and that the death was the result of some criminal agency. *United States v. Crider*, 45 C.M.R. 815 (NMCMR 1972). Production of a body or parts of a body is not required, *United States v. Williams*, 28 Fed.Cas. 636, 642 (1858); *Rex v. Hindmarsh*, 2 Leach 569, 168 Eng.Rep. 387 (1792); nor is it necessary that the evidence proving the *corpus delicti* connect the accused to the death of the victim. *People v. Cullen*, 37 Cal.2d 614, 234 P.2d 1 (1951); *Riggs*, 201 P. at 272. *Corpus delicti* is sufficiently proven when a *prima facie* case has been established. *State v. Lung*, 70 Wash.2d 365, 423 P.2d 72, 76 (1967). The *corpus delicti* can be proved by circumstantial evidence. *People v. Scott*, 176 Cal.App.2d 458, 1 Cal.Rptr. 600, 619 (1959); *Williams*, 28 Fed.Cas. at 643.

Once the *corpus delicti* has been proven, the fact finder may consider extrajudicial statements, admissions, and confessions of an accused to determine whether the Government has proven all of the elements of the crime alleged. *People v. Duncan*, 51 Cal.2d 523, 334 P.2d 858 (1979). Proof of the *corpus delicti* must exist independently of an accused's extrajudicial statements, admissions and confessions before the court may convict based on an accused's statements; in other words, an accused may not be convicted solely on the basis of his extrajudicial statements, admissions and confessions. *Cullen*, 234 P.2d at 7; *People v. Hiser*, 267 Cal.App.2d 47, 72 Cal.Rptr. 906, 41 A.L.R.3d 1353 (1968); *Commonwealth v. Lettrich*, 346 Pa. 497, 31 A.2d 155 (1943). Although the Government must establish a *prima facie corpus delicti* prior to the consideration of any extra judicial statements made by the accused, it need not establish proof of all of the elements of the crime before such consideration. *See Cullen; People v. Hiser; State v. Lung*, 70

Wash.2d 365, 423 P.2d 72 (1967). The order of proof is discretionary. *Id.* The accused's statements, however, may be used to determine the reliability of the evidence of the *corpus delicti. See Lung,* 423 P.2d at 76, *Grimes v. State,* 204 Ga. 854, 51 S.E.2d 797, 801 (1949).

In applying the facts of appellant's case to the law set forth above, we find that Bella had not been seen or heard from since the late evening of 16 March 1988. No body has been found. Shorts identified by Bella's best friend as belonging to Bella were found at the beach near the pier. A bedspread identified as one similar to one owned by the Elmore's was also found at the beach near the pier. Appellant's car was seen heading off-base, toward the pier after 0330 of the morning in question. Testimony from a fellow diver was that no one could have swum to the beach in those currents from the end of the pier that night. Appellant's auto and house were both cleaned thoroughly immediately after Bella's disappearance, which was unusual as testimony was that both were generally a mess. Further, all of Bella's identification, including passport, military dependent identification card, working permits and the rest of her clothes and jewelry, were found in the Elmore home during a permissive search. We find the evidence of record sufficient to support a finding that Bella Elmore is dead.

▬▬▬ As to the second prong of *corpus delicti* we also find sufficient evidence to support the fact that Bella's death was the result of a criminal agency. A fact finder may regard bloodstains not satisfactorily explained as a circumstance in determining whether or not a murder has been committed. *Wilson v. United States,* 162 U.S. 613, 16 S.Ct. 895, 620, 40 L.Ed. 1090, 1095, (1896). Bella's blood type was A positive. This type of blood was found on the sheets and mattress pad at their house, and the Government's expert testimony, hotly disputed by the defense expert, was that this blood was venous or peripheral blood, and not menstrual blood, as its position and pattern on the sheets and mattress pad would indicate. It also was present on a

knife used for the cleaning and cutting of fish owned by appellant. A pair of stained blue shorts washed up on the beach within days of Bella's disappearance, were positively identified by two of Bella's friends as hers, but had been washed by their finder, so no blood-type identification of the stains was possible. The bedspread, washed up on the beach approximately 6 kilometers from the pier about a month later and identified by Maria Pryor as belonging to the Elmore's, had been saturated with blood, notwithstanding that any conclusive analysis as to the type or "humanness" of the blood was possible due to its exposure to the elements. We find the Government sufficiently established Bella's death was the result of a criminal agency and thus a *prima facie corpus delicti.* Based upon that finding, and considering the appellant's testimony at trial as well as the implications of his extrajudicial statements and all of the inferences thereto, we find that there is sufficient evidence of record as a matter of law from which the court members could find appellant guilty beyond a reasonable doubt of premeditated murder in violation of Article 118(2), UCMJ.

▬▬▬ Having found the evidence legally sufficient to support a finding of guilty, we now turn to the issue of factual sufficiency. The test for factual sufficiency, which we must meet, is "whether, [we] are [ourselves] convinced of the accused's guilt beyond a reasonable doubt." *United States v. Turner,* 25 M.J. at 325. Conviction can be had solely on circumstantial evidence. Additionally, beyond a reasonable doubt does not mean that the evidence must be conflict-free. *United States v. Lips,* 22 M.J. 679 (AFCMR), *pet. denied,* 24 M.J. 45 (C.M.A.1987). On the other hand, in a murder prosecution where a body of the alleged victim cannot be produced, conviction must be based upon cogent circumstances that exclude every reasonable doubt. *Scott,* 1 Cal.Rptr. at 621–622; *Williams,* 28 Fed.Cas. at 643. If the fact finder is convinced that an accused has volunteered false statements on his own behalf or in response to inquiries from others, that fact finder has the right to consid-

er such statements along with all other circumstances of the case in determining whether the accused's conduct has or has not been satisfactorily explained and to regard false statements as tending to show guilt. *Wilson v. United States,* 162 U.S. 613, 621, 16 S.Ct. 895, 898, 40 L.Ed. 1090, 1095 (1896).

> "The fabrication of false and contradictory accounts by an accused criminal, for the sake of diverting inquiry or casting off suspicion is a circumstance always indicatory of guilt. If the jury believed that the statements made by the prisoner of the occurrence were false, his falsehood was therefore at least a circumstance affording some presumption against his innocence.... (Citation omitted.)"

*Commonwealth v. Lettrich,* 31 A.2d at 156. But we also believe that "[w]here an act may be attributed to a criminal or an innocent cause, it will be attributed to the innocent cause rather than the criminal one." *Riggs,* 201 P. at 281 citing *People v. Ahrling,* 279 Ill. 70, 116 N.E. 764 (1917).

 We have considered the evidence of record that appellant believes raises reasonable doubt of his guilt: no body or traces of a body have ever been found; the claim in his petition for a new trial that others saw Bella alive after the date of her alleged death and trial testimony that a woman who resembled Bella was seen in the week after her disappearance, in Carnavon (300 miles from Exmouth) and/or Perth (1000 miles from Exmouth); and, no one witnessed the murder itself or any events occurring at the pier around the time in question. Although the Government expert, Mr. Werner, a serologist, determined the blood on the bedspread and mattress pad was determined to be venous blood, he made that determination by a particular type of test (LDH—Lactate dehydrogenase, which reveals isozyme bands in the blood, and by the presence or absence of certain of these bands reveals blood to be peripheral (venous) or menstrual) that the defense expert regarded as unreliable, particularly in light of the age of the stains.

The Government theory of the case appears to be that appellant killed Bella by stabbing her and then throwing her off the pier to conceal her death, though such a direct act (stabbing) was not charged in the premeditated murder specification. Despite the evidence that appellant claims raises reasonable doubt, we find the evidence supports the Government's theory. Appellant put himself on the pier after 3 o'clock in the morning of 17 March, and his story about Bella falling in while he was approaching her from 30 yards away does not ring true in light of his further failure to telephone for help or throw her a life buoy, nonchalantly go home, go to bed and arise the next morning, go to PT formation and not tell anyone of the "accident", even to the extent of not telling his best friend with whom he drove to work that morning. Appellant's actions of deceiving members of his command at Holt, lying to the police concerning his activities that evening, and misleading those who were assisting him in searching the area to find his missing wife, an area he knew she was not, and his concern to search the beach area alone, show strong consciousness of guilt. Additionally, although appellant denied knowledge of the nature and strength of the tides that particular evening, he was a BM3 who was familiar with the pier and its surroundings; and, he was a diver familiar with the treacherous nature of the waters surrounding the pier. His actions and rationale for his actions do not support a reasonable hypothesis of innocence. Considering all of the cogent circumstances, and after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we find that we are legally and factually convinced beyond any reasonable doubt that the appellant murdered his wife, Bella Elmore, and is guilty of the offense of which he was convicted.

In appellant's next assignment of error he argues that the military judge abused his discretion in admitting statements made by the victim because they were hearsay and not relevant. The military judge instructed the members that they could consider the statements "for the limited pur-

pose of establishing what her state of mind was—whether or not she feared the accused and *as it went to their marital status.* You may not consider the evidence for any other purpose...." (Emphasis added.) The defense made a motion *in limine* to prevent the admission of several statements that Bella made as would be testified to by third party witnesses. The military judge denied the motion as to some of the statements and granted as to others; but, as to those he denied, he told the defense: "Now, when and if this evidence is presented, you are certainly free to object to high heaven and draw whatever cautionary instructions you so desire." Upon further discussion between counsel and the military judge, the latter stated:

Well, let me just say that in ruling on the motion in limine I'm not going to rule on the eventual admissibility or inadmissibility of the evidence or whether or not a cautionary instruction is going to be given. At this point, I can look at the motions of the parties, I can look at your analysis, and I think I can pretty well determine whether or not a blanket prohibition is in order or not and that's all we're talking about at this point. As the evidence develops and the issues are sharpened, focused, if you want to renew any of these motions, please feel free to do so at that time.

The military judge subsequently reiterated the fact, not only at the motion stage of the trial but also during the trial proceedings, that as the objectionable statements were offered, the defense was free to renew its objection for the military judge to make a final decision based on the specific situation at the time.

 Of the twelve out-of-court statements appellant now challenges as inadmissible, two were not addressed during the motion *in limine*—"She told me that Wayne tried to kill her"; and, "She said that Wayne tried to choke her." Neither were those statements objected to by defense at the time of the admission. As to the remaining ten, we find that the defense failed to object to the admission of the statements at the time they were offered; it failed, therefore, to preserve any objec-

tion. *United States v. Gamble,* 27 M.J. 298 (C.M.A.1988). Furthermore, the defense not only did not object to the limiting instruction given by the military judge but told the military judge that that was now its only concern with regard to the victim's statements that related to the appellant's allegedly pushing her off the boat, smothering her with a pillow, and grabbing her hair and threatening to kill her if she left him. Finally, the defense, at the time, admitted that it had opened the door for the admission of these out-of-court statements. We find that they were admissible as statements tending to rebut the description of the state of appellant's marriage as testified to by Bella's friend upon cross-examination by civilian defense counsel, who thus opened the door and acknowledged that the door was opened. Thus, as to all twelve statements asserted as erroneously and prejudicially admitted by the military judge, we find that any objections were either waived or failed for lack of preservation of the objection.

Appellant cites *United States v. Brown,* 490 F.2d 758 (D.C.Cir.1973), for the proposition that the statements are inadmissible because they were offered by the prosecution solely for the purpose of establishing the victim's state of mind, *i.e.,* fear, of the appellant. *Brown* holds that a victim's extrajudicial statements of fear of a defendant are admissible under the state of mind exception to the hearsay rule only if there is a manifest need of such evidence. Even then it must be accompanied by a limiting instruction that informs the fact finder that such matters are to be considered solely on the issue of the victim's mental state and not for the truth of the matters contained therein. The "manifest need" qualification relates to whether the extrajudicial statements are relevant to a material issue in the case, such as, self-defense, suicide, or accidental death. *Brown* further holds, however, that at least four factors must be used to determine whether the hearsay evidence of the victim's state of mind should still be excluded because it is too prejudicial to the defendant's case. Those factors are: whether the statements in

question recount past acts of the defendant; whether the statements bear proximately on vital issues in the case; whether statements are otherwise corroborated by the evidence; and whether the statements are so inflammatory as to create a substantial danger of undue prejudice. *Id.* at 775–777. The principal distinction between appellant's case and Brown's is that Brown preserved his objections. Appellant did not. Appellant's counsel agreed that the door was open to impeach the defense theory of a satisfying marital relationship, did not renew or initially object to the statements when offered, and did not object to the limiting instructions given by the military judge. In fact, at one point, civilian defense counsel specifically stated: "I agree with you, Your Honor. There's no question about her state of mind being very relevant."

The other distinction between appellant's case and Brown's is that the military judge admitted the statements on two grounds, fear of the victim and the state of the Elmore's marital status. Both grounds go to support proof of the *corpus delicti* in that they provide evidence of means, motive and opportunity. Finally, even if the statements identified by appellant as prejudicial to him were declared inadmissible by our adopting the *Brown* principle, we would find that their exclusion would not change the results because of the substantially similar testimony given by other witnesses during the trial. Those statements, similarly, were never requested to be suppressed by a motion *in limine*, objected to at the time of their admission, nor assigned as error on review. Accordingly, if there was error, which we do not find, the error was harmless.

■ As to appellant's fourth assignment of error, our review of the record leads us also to the conclusion that civilian defense counsel's failure to object to the admission of the out-of-court declarations by the victim as assigned by appellant on review as well as his failure to object to testimony relating to specific instances of misconduct was not ineffective assistance of counsel. As we read the defense pre-

sentation throughout the proceedings, the civilian defense counsel's approach to appellant's case was based upon a trial strategy of trying to attack the credibility of Filipino witnesses as supported by the credibility of his client. This Court will not second-guess defense trial strategy or tactics on review. *United States v. Jefferson*, 13 M.J. 1 (C.M.A.1982); *United States v. Rivas*, 3 M.J. 282 (C.M.A.1977). Regardless, the defense has failed to overcome the presumption of sound defense trial strategy. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *United States v. Snoberger*, 26 M.J. 818, 821 (ACMR 1988). Even assuming the hearsay statements and specific instances of misconduct were inadmissible and that civilian counsel's performance was deficient, thus meeting the first prong of the test for ineffective assistance of counsel, *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the assertion still fails because appellant fails to show that the deficient performance prejudiced his defense. We arrive at that conclusion because we find that in disregarding the hearsay statements and the specific instances of misconduct, we remain convinced beyond a reasonable doubt of the appellant's guilt based on his four contradictory statements and his conduct subsequent to Bella's disappearance that prove to us the appellant's consciousness of guilt and establish his specific and premeditated intent to kill his wife.

■ Appellant asserts in his fifth assignment of error that the members were improperly informed that the appellant had invoked his Fifth Amendment right against self-incrimination during custodial interrogation. This assertion arises from the circumstances occurring during his questioning by Detective Sergeant Balchin, after appellant had given three inconsistent explanations to the police regarding events of the night of 16 March. Appellant had previously been interrogated by the police on three separate occasions, and had had his residence searched and evidence seized. During the interview in question, Detective Balchin told appellant that he suspected appellant of killing his wife. Appellant

broke down and cried, denied he was a killer, asked to see LT Spillane, the station judge advocate, and refused to sign the prepared record of interview or talk further to the police. Appellant claims that the fact that his belated invocation of his right to silence, after being told that he was suspected of murder, "was paraded before the members," clearly suggested to the members that his refusal to cooperate was motivated by guilt; this, he further argues, violates the constitutionally based prohibition against use of an individual's refusal to submit to interrogation. As a result of this violation of his rights he was prejudiced, and therefore entitled to a new trial. The Government, citing *United States v. Frentz*, 21 M.J. 813 (NMCMR 1985), states that the defense is indulging in overstatement, that it is harmless error where the members are made aware of appellant's invocation of his Fifth Amendment rights, when, as here, the appellant failed to object to the evidence at trial or make any claim during appellate review that he was induced to testify and explain his invocation of rights because of the potentially prejudicial impact upon his case if he did not answer the Government's evidence pertaining to his invocation of rights. *See United States v. Velez*, 22 M.J. 637, 640 (ACMR 1986). In this case, appellant's termination of his interview with Australian authorities was mentioned only once during the Government's case, and trial counsel made only passing comment on the appellant's termination of the interview only during her rebuttal closing argument to the members. Civilian defense counsel did, on the other hand, conduct a very extensive cross-examination of Detective Sergeant Balchin on the accuracy of appellant's statements and his desire to terminate the interview and refusal to read and sign the typed verbatim interview. Throughout the cross-examination civilian counsel tried to establish the fact that the interviews of appellant were conducted in a frightening, coercive atmosphere in light of appellant's situation as a young Navy man of whom much was expected, who was being subjected, for the first time in his life, to the total control of the Australian

police authorities. The defense theory was that the coercive atmosphere was enhanced by the Australian police because they advised him that he was not Australian; he had no American rights; and, he was now subject to Australian rules.

Although comment upon an accused's invocation of his Fifth Amendment rights is error, we find no possible harm in appellant's case because the defense never objected to the evidence when it came in through the narrative testimony of Detective Sergeant Balchin nor did the defense object at the time of trial counsel's rebuttal argument. Additionally, "however inadmissible such evidence may have been upon proper objection, such evidence is only excludable as a shield against utilizing the appellant's invocation of rights. *See United States v. Fairchild*, 505 F.2d 1378." *Frentz*, 21 M.J. at 818. Where, as here, appellant himself testifies (with no qualifications that such testimony was offered solely to protect himself from the adverse impact created by the prosecution's evidence) on direct examination about his invocation of his rights and where civilian defense counsel's extensive use of that evidence during cross-examination and inferences to it during closing argument become part of the defense strategy for attacking the credibility of the Government's witness' testimony regarding the conduct of the interview and as an explanation for the various inconsistent statements made by appellant, such strategy adopts the shield as a sword and the consequences thereof must be borne by the swordbearer. *See Frentz*, 21 M.J. at 818. We are convinced that no error was committed; but, even assuming error was committed, we are further convinced beyond a reasonable doubt that any such error was harmless. *Id.*

As to appellant's sixth assignment of error, *i.e.*, whether the appellant's constitutional rights were violated by the pretrial contact between a Government witness and the court members, the record reveals the following facts. Mr. Werner, the Government expert witness who testified at trial concerning the presence and type of blood stains on various items, had dinner with the

members of the panel the night of 25 July. That date was the first day of trial with the court assembled. The members, when voir dired individually on the communications, were not as one with their answers, but when taken in the light most favorable to appellant, stated that Mr. Werner told them he was a witness at the court-martial, that he was a CID agent who worked at the Army Crime Laboratory in Atlanta, had worked with the FBI on various cases, and testified at other courts-martial. These were not the exclusive topics of conversation, of course; but they were the topics that had any relevance for potentially prejudicing the appellant's case. To compound matters, Mr. Werner breakfasted with three of the members the next morning. Mr. Werner explained the next day that he sat with the members at dinner because the restaurant did not allow patrons to occupy a table by themselves. Mr. Werner testified that he did not realize he was dining with members, and they did not discuss the case. He also testified that he could not have said he worked with the FBI because he never had; but he might have made a comment to the effect that he had gone to school at the FBI Academy.

The defense moved for a mistrial. The military judge found that Mr. Werner's credibility was not improperly bolstered by these contacts with the members, and that appellant was not harmed by these contacts. He then denied the motion.

■ It is well-settled military law that *ex parte* communications between court members and witnesses are absolutely forbidden; that such communications will invalidate a finding unless the Government establishes that the contact is harmless. *United States v. Adamiak*, 4 U.S.C. M.A. 414, 15 C.M.R. 412 (1954). In other words, such communications establish a presumption of prejudice that is rebuttable. The military judge determines whether the Government has rebutted the presumption of prejudice. *Adamiak*, 15 C.M.R. at 417. The standard for rebuttal is a " 'clear and positive showing' that the improper communication from a third person or witness

did not and could not operate in any way to influence the decision." *Id.* at 418.

■ After reviewing the record, we find that the Government successfully rebutted the presumption of prejudice created by Mr. Werner's two contacts with the court members and that appellant was not prejudiced. Mr. Werner's statements did not relate to either the expertise involved in the appellant's case or anything relevant to the offenses in general. Instead, they were oriented toward a more casual and general conversation. There is no evidence of tampering or attempting to influence the members. Although the conversations between the court members and Mr. Werner were improper, they were harmless. We also note that the member whose memory of the conversation most supported the defense assertion of prejudice was successfully challenged off the court by the defense. We note that with regard to this member's memory, no other court member's memory was in any way similar. *See United States v. Almeida*, 19 M.J. 874, 875 (AFCMR 1985); *but see United States v. Adamiak*. Thus, we also find that the military judge did not abuse his discretion when he denied the defense motion for mistrial. *United States v. Jeanbaptiste*, 5 M.J. 374 (C.M.A. 1978).

■ Whether appellant was unduly prejudiced by the military judge's instruction on attempted murder is the seventh error assigned by appellant. Appellant claims that the military judge's instructions on the elements of attempted murder were prejudicially erroneous. The specification alleging premeditated murder, as instructed upon by the military judge, stated that murder was accomplished by an unknown act of force and violence. His instruction on the lesser included offense of attempted murder was that, if committed, the attempt was accomplished by certain acts, "that is, cut with a knife and throw into shark-infested waters off the navy [*sic*] pier, his wife, Bella Elmore." The defense argues that the practical effect of this "restrictive" instruction on attempted murder was to preclude improperly the members from considering the appellant's guilt of at-

tempted murder on the theory that he attempted to murder her through "an unknown act of unlawful force or violence," and could find the lesser offense only if they found that the appellant had cut his wife with a knife and thrown her off the pier. The Government's response is that appellant's failure to object to the instruction prior to its issuance constitutes waiver of any objection, and that in any event, because only murder, involuntary manslaughter, and negligent homicide were instructed upon (other than attempted murder), the members needed only to conclude that Bella was still alive to either acquit or find him guilty of attempted murder, and that by their finding of guilty to murder the members concluded that Bella was dead, precluding any consideration of attempted murder as an offense. We find that the instruction was not objected to by the defense either at the time the military judge discussed with the parties the instructions to be given or at the time it was, in fact, given to the members. The failure of the defense to object constituted waiver; the waiver did not constitute plain error; therefore, we find the assignment is without merit.

▪▪▪ The defense assertion in its eighth assignment of error that the Government unlawfully suppressed impeachment evidence, which error should have allowed a mistrial motion to be granted, is without merit. The Government conducted extensive tests of a blanket, thinking that forensic evidence might result from it. The blanket in fact did not belong to appellant, and came to be in his possession from UT2 Kanachki, who lent appellant his 4–wheel drive vehicle after Bella's disappearance. The blanket was never offered as evidence at trial, though it was at the Article 32 investigation, and had no impact on the findings in the case. The defense argues that this lack of evidence could have been used to impeach the Government's case, and that the Government was obligated to inform the defense as to why the blanket was not being offered into evidence. Granting of a mistrial is within the discretion of the military judge and is reviewable only for abuse of

that discretion. *United States v. Anderson*, 21 M.J. 751, 756 (NMCMR 1985). An abuse of discretion finding is appropriate "only in cases where substantial doubt has been cast upon the fairness or impartiality of the trial." *Id.* at 756. The military judge did not abuse his discretion by refusing to grant a post-trial motion for mistrial. Even had the Government disclosed its reasons for not offering the blanket into evidence, which it was not obligated to do, it did inform the defense prior to trial that it would not be offered, therefore no deliberate and uninformed suppression occurred. In any event, neither the good faith nor bad faith of the prosecution is the test for failure to disclose evidence by the Government. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Even assuming error, we find no chance that the results of the trial would have been different. *See United States v. Eshalomi*, 23 M.J. 12 (C.M.A. 1986) (where the prosecution had deliberately withheld the medical record and previous statement of the victim of an alleged rape, the defense was prejudiced).

▪▪▪ Appellant also petitions us for a new trial. We find that the evidence presented by Mr. McKinnon is not newly discovered evidence as required by Article 73, UCMJ, 10 U.S.C. § 873; it is evidence that merely tends to corroborate the testimony of Mr. Yazmadjiam who testified at trial. Besides, we are convinced that Mr. McKinnon's testimony would not have changed the outcome of appellant's court-martial in that the testimony of the two witnesses, Mrs. Davies—a Justice of the Peace—and Mr. Yazmadjiam, concerning their similar sightings of a woman resembling Bella after the date of her alleged death as presented by the defense at the time of trial was considered and rejected by the court members. That Mr. McKinnon's sighting was similar to Mr. Yazmadjiam in that the woman he saw was in the same city on the same day in the same general vicinity as the woman seen by Mr. Yazmadjiam, and thus might tend to enhance the credibility of Mr. Yazmadjiam, does not sufficiently persuade us that it was Bella

Elmore that either witness saw. Although each witness saw an individual who resembled Bella Elmore, their description of that individual as to her appearance, speech, dress, and conduct are sufficiently different from that described at trial by her friends that we are convinced they were mistaken as to the individual's identity. Even if we accepted Mr. McKinnon's affidavit as newly discovered evidence, we do not find that it would, if considered by a court-martial in light of all other pertinent evidence, probably produce a substantially more favorable result for the appellant. Rule for Courts–Martial 1210(f)(2)(C), Manual for Courts–Martial, United States, 1984.

The petition for new trial is denied. The findings and sentence as approved on review below are affirmed.

Judge WILLEVER and Judge JONES concur.